Filed 12/23/15  In re R.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re R.S. et al., Persons Coming Under the Juvenile Court Law. | B263793 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK09547) |
|     Plaintiff and Respondent, | |
| v. | |
| E.S., | |
|     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Debra Losnick, Judge.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel and Sarah Vesecky, Deputy County Counsel, for Respondent.

_____

E.S. (mother) appeals from the order sustaining a Welfare and Institutions Code section 300 petition as to her children, R.S. and S.S., and awarding sole legal and physical custody of the children to their father, Russell S. (father).[1]  Mother challenges the sufficiency of the evidence to support dependency jurisdiction and disposition based on her mental illness.  She also contends it was an abuse of discretion to restrict her to monitored visits.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal from an order sustaining a section 300 petition (*In re E.B.* (2010) 184 Cal.App.4th 568, 578), the evidence established that father and mother were married in November 2006.  Daughter, R.S., was born in 2007 and son, S.S., was born in 2010.  Mother showed signs of mental illness after S.S. was born.  Between 2011 and early 2015, mother was hospitalized numerous times, sometimes for several weeks at a time, as the result of her mental illness.  At varying times, she was diagnosed with postpartum depression, bi-polar disorder, psychosis, schizoid and general depression.  When mother was hospitalized, maternal grandmother cared for the children.  When mother was not hospitalized, the children were ostensibly in mother's care, but concerned family members checked on them frequently.

The family came to the attention of the Department of Children and Family Services (DCFS) on Sunday, January 18, 2015, after mother walked into a police station and reported that father and paternal grandmother were abusing the children.  From the police station, mother called DCFS.  A police officer told the DCFS social worker that mother did "not look mentally stable" and there appeared no reason to investigate her accusations; mother refused the social worker's offer to check on the children's welfare.  Mother was apparently hospitalized that day pursuant to section 5150.  Mother was still

---

[1]     All future undesignated statutory references are to the Welfare and Institutions Code.

hospitalized three days later when she called DCFS and recanted her abuse allegations against father and paternal grandmother. Mother denied any mental illness and said she intended to file for divorce once she was released from the hospital. During the telephone interview, mother "kept laughing and making incoherent statements . . . ." That same day, father told the social worker that mother had recently stopped taking her medications, including birth control; she had a "psychosis episode" over the prior weekend; they argued and mother left the house; when she did not return, father filed a missing persons report. The children were with maternal grandmother. The next day, a social worker interviewed the children and maternal grandmother at maternal grandmother's home. Each denied abuse by anyone. Maternal grandmother said mother was a wonderful mother when she took her medication, but slept a lot when she did not take it. Maternal grandmother's ability to assist mother was recently hindered by an argument between mother and a maternal aunt over a trivial matter. Maternal grandmother believed some of mother's problems stemmed from father's close relationship to paternal grandmother.

About a week after the initial referral, father told the social worker he was concerned that mother, who was to be released from the hospital that day, was "a ticking bomb" if she did not take her medications. That night, mother called the police to ask for protection after father tried to discipline S.S. Father reported the police said mother was " '5149' borderline," and told her to go to sleep.[2] The social worker interviewed mother, father and both children at the family home the next day. Father, a teacher in the Los Angeles Unified School District, said he had taken time off work to make sure mother was stable; he intended to take the children to maternal grandmother's home when he returned to work. Father denied mother's accusations that he was in a cult (father was an Orthodox Jew affiliated with Chabad). Although mother would not leave the bedroom to talk to the social worker, father gave the social worker permission to enter the bedroom. But mother became so agitated when father took the children out of the bedroom, that she

_____

[2]     Presumably, father was referring to section 5150.

could not answer the social worker's questions. Mother said she did not want the children with father because he loved paternal grandmother, not the children.

A few days later, the DCFS hotline received a report from someone at Kaiser Hospital that mother had missed her appointment for a "post hospitalization treatment plan." A maternal aunt told the social worker that mother was "labiley" (i.e. unstable) and "irrational by crying, and then being calm, and then crying again." Two days later, mother was involuntarily committed to Kaiser Hospital pursuant to section 5150. Father planned to keep the children with him for a few days to give maternal grandmother a respite, then bring them back to her.

About two weeks later, father and maternal grandmother attended a child family team meeting (CFT); mother was still hospitalized and not present. Father reported that mother would not authorize access to her mental health records and threatened to file for divorce if father tried to visit her in the hospital. Although father's goal was for mother to stabilize and be able to care for the children herself, he consented to having the children detained to avoid a court-ordered detention; it was further agreed that maternal grandmother would continue caring for the children. Following a detention hearing, the juvenile court found father non-offending; it ordered the children detained from mother and placed with father; mother was given monitored visits. A disposition hearing was set and DCFS was ordered to report on "a section 301 dismissal."[3]

Mother was discharged from Kaiser Hospital about a week later. Her discharge summary states: "ASSESSMENT: SCHIZOAFFECTIVE DISORDER (primary encounter diagnosis) [¶] Acutely psychotic, gravely disabled adult." Mother filed for divorce. Apparently because of the monitored visitation order, mother spent weekend nights at maternal grandmother's home while the children were with father in the family

---

[3] Welfare and Institutions Code section 301, subdivision (a) provides the social worker may, "in lieu of filing a [section 300] petition or subsequent to dismissal of a petition already filed, and with consent of the child's parent or guardian, undertake a program of supervision of the child. . . ."

home, and weeknights at the family home while the children were with maternal grandmother.

For the Jurisdiction/Disposition Report, the social worker interviewed father and mother, the children, maternal grandmother and mother's psychiatrist, Dr. Glass. Dr. Glass characterized mother as "extremely intelligent," but cautioned that her mental health was extremely variable. Mother suffered from "schizo-affective disorder," was also "somewhat psychotic and had paranoid delusions" and occasionally "catatonic." In Dr. Glass's opinion, "stress was a major trigger of mother's mental health issues and that clearly raising two children and the relationship with her husband was a serious stressor for mother." Although Dr. Glass "did not believe that mother was a danger to the children or herself," she was not "capable of providing regular care and supervision of the children on her own." Dr. Glass "felt it was important that either father or maternal grandmother was around mother and the children to ensure that they would be cared for properly, especially considering their very young age."

Mother told the social worker that her deceased father (maternal grandfather) suffered from mental illness, including paranoia and possibly psychosis. Mother admitted having uncontrolled thoughts and paranoia; she did not have any hallucinations but "continually" heard father's and maternal grandmother's voices in her head. Mother estimated she had been hospitalized between 12 and 14 times over the past four years, usually for two or three weeks at a time. Mother blamed her mental health problems on emotional and psychological abuse by father and maternal grandmother. She claimed to be medication compliant, but explained that her doctor was in the process of lowering the dosage of her psychotropic medications and the lower dosage appeared to be insufficient to control her symptoms. Regarding the false allegations of child abuse she made against father and paternal grandmother, mother said she panicked because she did not want father to take the children to a party. Mother's goal was to take care of the children herself once she no longer lived with father. Meanwhile, maternal grandmother was monitoring mother's visits with the children at maternal grandmother's home.

Father denied emotionally abusing mother. He recounted mother once "set a place[] at the dinner table for the Devil so that he could eat with the family;" mother "would at times be speaking nonsense to herself and would sometimes just stare blankly out into space." To father's knowledge, mother had never been suicidal and "he did not believe that mother would ever harm herself or the children in any way." Nevertheless, father and maternal grandmother "were always around mother and the children and that due to mother's many hospitalizations over the years they had worked out a schedule to care for the children when mother was unable to."

Maternal grandmother confirmed maternal grandfather's mental illness, mother's multiple hospitalizations and working with father to care for the children when mother could not. She was unsure whether father was actually abusive towards mother, but indicated he "could be a trigger to mother's mental health problems and that the relationship had been somewhat questionable for quite some time."

Seven-year-old R.S. and four-year-old S.S. both missed mother and wanted her to come home. R.S. knew mother was "sick" and had been hospitalized many times, but mother never acted in a way that gave R.S. concern. Both children were doing well spending weekdays with maternal grandmother and weekends with father.

DCFS recommended that the children be found dependent children, remain placed with father, that mother continue to have monitored visits and and that the family receive family maintenance services.

According to a Last Minute Information For The Court filed the day of the jurisdiction hearing, at a CFT a few days before, "mother was fixated on specific things, such as clothing and food for the children. Mother was adamant that the children would starve in two days if mother was not provided with money to buy the children food. . . . Moreover, both parents agreed to participate in co-parenting as they agree that there is conflict in how they are currently raising their children, with father wanting to continue raising children Jewish Orthodox and mother wanting the children to be free from control and for children to wear and eat what they want." DCFS asked for an Evidence Code section 730 evaluation of mother.

6

Mother and father both appeared and were represented by counsel at the jurisdiction and disposition hearing on April 2. By that time, father and the children were living with maternal grandmother in her home. No witnesses testified. Regarding jurisdiction, mother asked that the petition be dismissed. Acknowledging her mental and emotional problems, hospitalizations and medication non-compliance, mother's counsel argued there was no "evidence to show that there is a substantial risk of serious physical harm or illness or there is a future risk of serious physical harm or illness to the children. . . . [¶] It does appear from the mental health professionals and from other persons interviewed that she's not capable of regular care and supervision. It is the mother's position that the department has to show there is a substantial risk of harm. [¶] It is the mother's position the department has not met the burden." Not persuaded, the juvenile court sustained the petition, basing section 300, subdivision (b) dependency jurisdiction on the following:

> "[Mother] has mental and emotional problems including a diagnosis for schizoaffective disorder and schizophrenia which render the mother incapable of providing the children with regular care and supervision. Since January of 2015, the mother has had two involuntary hospitalizations for the evaluation and treatment of the mother's psychiatric condition. The mother has failed to take the mother's psychotropic medication as prescribed. The mother's mental and emotional condition endanger the children's physical health and safety and places the children at risk of serious physical harm and damage."

Regarding disposition, mother argued there was no evidence of substantial risk of physical harm to the children if they were returned to her custody. Alternatively, if the juvenile court was inclined to close the case with a family law exit order, mother requested joint legal custody. Finding by clear and convincing evidence that mother's mental illness prevented her from caring for the children, the juvenile court placed them with father, gave father sole physical and legal custody, gave mother monitored visits and terminated juvenile court jurisdiction with a family law order.

On April 6, the juvenile court filed a "Custody Order – Juvenile – Final Judgment" in both the dependency case and the family law case, which terminated dependency

7

jurisdiction, awarded father sole legal and physical custody and gave mother weekly monitored visits. Mother timely appealed.

## DISCUSSION

*A.    Sufficiency of the Evidence*

### 1.    Standard of Review

In dependency proceedings, the standard of proof at the jurisdictional stage is a preponderance of the evidence. At the dispositional stage, it is clear and convincing evidence. On appeal, we review the juvenile court's jurisdictional and dispositional findings for substantial evidence. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438 [jurisdiction]; *In re Miguel C.* (2011) 198 Cal.App.4th 965, 969 [disposition].)

Under the substantial evidence standard, "all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]" (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.) But " 'substantial evidence is not synonymous with *any* evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]." [Citation.] "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

### 2.    The Jurisdictional Finding

Mother contends insufficient evidence supports the jurisdiction order. She argues DCFS failed to show that mother's mental illness caused any serious physical harm to the children, or a substantial risk of any serious physical harm to them. We disagree.

Under section 300, subdivision (b), the juvenile court may assert jurisdiction over a child upon proof that the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness. . . ." (§ 300, subd. (b).)

The substantial risk of serious physical harm element does not require that a child actually be neglected before the juvenile court can assume jurisdiction under section 300, subdivision (b). (*In re I.J.* (2013) 56 Cal.4th 766, 773.) But it does require " ' "a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . ." [Citation.]' [Citations.]" (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1452.) It is DCFS's burden to show how the minors will be harmed and " 'harm may not be presumed from the mere fact of mental illness of a parent.' [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136 (*James R.*).) Because a parent's past conduct is a good predictor of future behavior, the juvenile court may consider past events when determining whether a child is at risk of future harm. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6; *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169.)

*In re James R., supra*, 176 Cal.App.4th 129, offers guidance. In *James R.*, four, three and one-year-old siblings came to agency attention when the mother was hospitalized after having a negative reaction to taking ibuprofen and drinking beer; although the mother had a history of suicide attempts, she maintained this incident was an accident. A section 300 petition alleged jurisdiction under section 300, subdivision (b) based on the mother's inability to provide regular care for the children as the result of her mental illness and the father's inability to protect the children. The evidence at the jurisdiction hearing included a psychotherapist's testimony that the mother did not pose a risk to her children and she was not a danger to herself or others. The juvenile court sustained the petition but left the children in the parents' custody on the condition they not be left alone with the mother. (*Id.* at pp. 121-134.) The Court of Appeal reversed,

9

reasoning the evidence showed the children were safe in the father's care and he was able to protect and supervise them. (*Id.* at p. 137.)

Although a parent's mental illness was the basis for section 300, subdivision (b) dependency jurisdiction in both this case and *James R.*, the similarities end there. Whereas a doctor in *James R.* testified without qualification that the mother in *James R.* did not pose a risk to her children, the only reasonable inference from Dr. Glass's opinion that mother could not properly care for the children without help from father or maternal grandmother was that the children would be at risk of harm if left in mother's care without such help. Here, there was substantial evidence that the children were at risk of physical harm because mother could not care for her children. Further, whereas the extended family provided a support system and the father could protect the children from the mother in *James R.*, that is not the case here. Here, mother did not believe she needed help caring for the children, she had filed for divorce and no longer lived with father, and was alienated from maternal grandmother – her only other source of support. On this record, particularly in light of the children's young age, sufficient evidence supports the juvenile court's finding that mother is unable to provide regular care for the children as a result of her mental illness.

Mother's focus on Dr. Glass's opinion that mother was not "a danger to the children or herself" for a contrary result is misplaced. In context, the only reasonable interpretation of the quoted phrase is that Dr. Glass believed mother was not homicidal or suicidal. That is, she would not *intentionally* harm the children or herself. But intent to harm is not an element of dependency jurisdiction under section 300, subdivision (b).

### 3.	Disposition

Mother challenges the sufficiency of evidence to support the disposition order removing the children from mother's custody and giving father full legal and physical custody. She argues there was not clear and convincing evidence the children suffered any physical harm caused by her mental illness, or that they were at any risk of such harm if they were returned to her custody. We find no error.

After finding a child is a person described by section 300, the juvenile court must conduct a dispositional hearing at which it decides, among other things, whether the child shall remain living with the parents or be removed from the parents and placed in agency custody.  (§ 358, subd. (a); § 362, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; *In re A.S.* (2011) 202 Cal.App.4th 237, 247.)  "[O]ur dependency system is premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests."  (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530 (*Henry V.*).)

Removal is governed by section 361, subdivision (c), which in relevant part reads:

> "(c) A dependent child shall not be taken from the physical custody of his or her parents . . .  with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances. . .
>> (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . .  The court shall consider, as a reasonable means to protect the minor, each of the following:
>>> (A) The option of removing an offending parent or guardian from the home.
>>> (B) Allowing a nonoffending parent . . . to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."

Section 361, subdivision (c)(1) reflects the legislative preference for a dependent child to "remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a disposition would harm the child."  (*Henry V., supra*, at p. 525.)  Removal " ' "is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent." [Citation.]' "  (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115.)

Before it may order removal, the juvenile court must consider whether the child can be protected by the less drastic means set forth in paragraphs (A) and (B) of section 300, subdivision (c)(1). For example, in *In re Jeannette S.* (1979) 94 Cal.App.3d 52, 61, the Court of Appeal reversed an order removing the minor from her mother's care, reasoning the juvenile court did not consider less drastic alternatives, including placing the minor with the father. (*Id*. at p. 59.) In *In re Hailey T.* (2012) 212 Cal.App.4th 139, three-year-old and four-month-old siblings were declared dependents pursuant to section 300, subdivisions (a) and (j), removed from the parents' physical custody and placed with relatives. The court of appeal found removal was not supported by sufficient evidence because the juvenile court did not consider less drastic measures, including the father leaving the home. (*Id*. at p. 148.)

Here, the juvenile court found by clear and convincing evidence that the children could not be returned to mother's custody. But it did not remove the children from parental custody altogether. Pursuant to section 300, subdivision (c)(1)(B), it selected the less drastic measure of allowing father, who was nonoffending, to retain custody.[4] The same evidence that supported jurisdiction supported removing the children from mother's custody. In particular, Dr. Glass's opinion that mother was incapable of providing care and supervision of the children on her own, considered together with the evidence that mother no longer had access to her prior support system, was sufficient evidence to establish a substantial danger to the children's well-being if they were returned to mother's custody.

### B. *Monitored Visitation*

Mother contends it was an abuse of discretion to award father full legal and physical custody and restrict mother to monitored visits. Her argument is essentially the same as her arguments challenging jurisdiction and disposition. We find no abuse of discretion.

---

[4] Since mother was no longer living with father and the children at the time of the disposition hearing, paragraph (A) of section 300, subdivision (c)(1) was also applicable.

" 'When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.' " (*In re Chantal S.* (1996) 13 Cal.4th 196, 203; § 362.4 ["When the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and proceedings for dissolution of marriage . . . of the minor's parents . . . are pending . . . the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child."].) We review visitation orders for abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)[5]

Here, it was not an abuse of discretion to order monitored visits for mother based on Dr. Glass's opinion that mother was not capable of providing care and supervision of the children on her own, and it was important either father or maternal grandmother was "around" to ensure the children were being properly cared for.

## DISPOSITION

The order is affirmed.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.

GRIMES, J.

---

[5] Mother does not challenge the order terminating jurisdiction itself, only the terms of the order. On appeal, she contends the juvenile court "should have returned to the parents' joint custody arrangement or granted mother custody of the children. . . ."