Filed 1/28/15; pub. order 2/5/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re COLE Y., a Person Coming Under the Juvenile Court Law. | B256594<br>(Los Angeles County<br>Super. Ct. No. CK 48405) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>K.Y.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Carlos E. Vasquez, Judge.  Affirmed in part and reversed in part.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn Harrison, Assistant County Counsel, and Melinda A. Green, Deputy County Counsel, for Plaintiff and Respondent.

_____

K.Y. (Father) appeals from the juvenile court's March 25, 2014 jurisdictional and dispositional orders (1) declaring five-year-old Cole Y. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect);[1] (2) terminating the case with a family court order granting physical custody to Mother and monitored visitation to Father of a minimum of four hours per week; and (3) requiring Father to complete various counseling programs as a condition to modifying the family court custody order. Mother is not a party to the appeal.

We conclude that substantial evidence supported the juvenile court's jurisdictional order, but that the March 25, 2014 dispositional order must be reversed to the extent it conditioned the family court's modification of the juvenile court's custody and visitation exit order upon proof of Father's completion of drug and parenting programs and counseling. In all other respects, the dispositional order is affirmed.

## BACKGROUND

**The section 300, subdivision (b) petition**

On March 14, 2014, the Department of Children and Family Services (DCFS) filed a first amended petition under section 300, subdivision (b) on behalf of Cole. As amended and sustained on April 16, 2014, the petition alleged under paragraph b-1 that Father allowed Amber D., an unrelated adult and current drug abuser, to reside in the home with unlimited access to Cole. On January 9, 2014, methamphetamine and a syringe were found in the home accessible to Cole. On January 9, 2014, Amber was under the influence of illicit drugs and possessed prescription medication not prescribed to her while Cole was under her care. In paragraph b-2, DCFS alleged on "2/[28]/2014," Father "had a positive toxicology screen for methamphetamines and amphetamines" and had a history of drug abuse and a previously sustained allegation regarding drug abuse.[2]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The original petition filed on February 15, 2014, contained only the allegation under paragraph b-1 of the section 300, subdivision (b) petition.

**Events leading up to the filing of the section 300, subdivision (b) petition**

DCFS conducted several interviews, whose substance it reported to the juvenile court. We now summarize DCFS's reports.

On January 9, 2014, DCFS received a referral of general neglect of Cole by Father. That day, after Father reported to police Cole had been missing for two hours, the police found Cole walking with Amber, three to four miles from home. She was "'extremely high'" with "facial sores commonly seen on narcotics users" and in possession of codeine. Amber was also in an agitated state. She said she had known Father for a few months and called him "'Babe.'" Amber stated Father was known to allow women who had been released from jail to stay in his home. He bought them drugs and had sex with them. Amber had a long criminal history and was on probation with a search condition. Amber had been released from jail a week earlier. She had misdemeanor and felony convictions for narcotics related arrests from February 2013 to December 2013.

Father told police Amber was Cole's babysitter and he had left Cole with Amber to give the cleaning lady a ride home. Initially, Father denied knowing anything about Amber and said he had hired her just two days earlier. Then he told police he had known her for a few months and that Amber and Danielle, a friend of Father's, had stayed overnight at his house a few months earlier. After police found methamphetamine and pipes in Amber's room, Father claimed Amber was not Cole's babysitter, but instead was a friend who needed a place to stay. The police also found sex toys, a syringe containing narcotics residue, and codeine in Amber's bedroom. Methamphetamine and additional narcotics in pill form were found on top of a "low-boy" dresser. Amber's room was not locked and was wide open. The police reported Father had been arrested twice when he was with Danielle and "'[t]his isn't the first time [Father] invited known heavy narcotics users into the house to babysit the child.'" The police were very concerned about Cole's welfare. Ten police calls had been made to Father's home since September 2011.

3

Father stated he had not seen any drugs in Amber's room "or anything that made him think about her having drug issues" for the two days she had stayed in his home. Father said he would not allow Amber back in the house to collect her belongings. Father was unable to provide Danielle's phone number. Father denied that he had ever been arrested and claimed to be unaware that Danielle had ever been arrested or that Amber had a long criminal history.

DCFS reported Cole was appropriately dressed and his room was neat and clean. Cole told DCFS Father took good care of him; Father took him to school and cooked meals for him. Cole said he felt safe with Father. Cole said he also felt safe with Mother and he liked Amber.

Paternal grandmother and Mother stated Father was a very good father. Mother said she and Father had interviewed babysitters in the past and he usually hired responsible babysitters. In an emergency, Mother and Father had used a babysitting Web site where the sitters were screened and subjected to background checks. She believed that Father was scared by the incident and would never "'do it again.'" Mother took care of Cole in her home Sunday afternoon through Wednesday night and every other Friday. Paternal uncle stated Father's "choice in women is not too good," but he believed him to be a good father.

A neighbor told DCFS Father had "a long history of having police come to visit him" and there was domestic violence when Mother had lived in the house with Father. The police told the neighbor Father had various women live with him in exchange for "'favors.'" The neighbor witnessed people smoking in a car parked outside Father's home, which might have indicated drug activity. She said Father did not watch Cole and assumed other people would look after him.

DCFS observed Amber's room was immediately next to Cole's room. Amber had a hookah on her shelf and two "inappropriate adult sexually provocative posters" on her wall, which DCFS recommended Father remove.

DCFS reported that in 2010, a petition filed on behalf of Cole had been sustained under section 300, subdivisions (a) (serious physical harm) and (b) based on Father's

4

domestic violence against Mother and Mother's and Father's current and past history of substance abuse. Voluntary services had failed because Father refused to participate regularly in random drug testing. In 2011, a petition alleging Father used methamphetamine and opium and had water pipes within Cole's reach was closed as inconclusive.

Father's drug tests in February 2014 were negative, but he subsequently failed to schedule a drug test after promising to do so and failed to give permission for an assessment to be done. On February 25, 2014, DCFS informed the juvenile court that Father might not understand that he had to comply with drug tests and requested that the juvenile court "clearly" order Father to comply with random and on-demand drug tests as a condition to Cole's remaining in Father's home.

DCFS filed the original section 300 petition on February 18, 2014. After Father tested positive for methamphetamine on February 28, 2014, DCFS filed the first amended section 300 petition on March 14, 2014.

**Events subsequent to the filing of the first amended section 300 petition**

On March 7, 2014, Cole was removed from Father's care and released to Mother. Mother told DCFS that Father had a history of "taking in women who had been previously incarcerated and giving them room and board for undisclosed services." Mother stated she was not surprised about the allegation that Father had left Cole in the care of a drug user because she "has always had serious concerns about [Father's] choices in regards to the women he spends time with." Mother stated past allegations of Father's drug use were true and she and Father had used methamphetamine in 2009. Mother reported Cole was "'terrified'" of Father and could not sleep at night, and Father had shown up unannounced at Mother's home and Cole's school. Mother was currently working as a loan officer and was living in a two-bedroom suite at a hotel, which DCFS deemed appropriate for Cole until she could save enough money for an apartment. The social worker observed that Cole appeared to be closely bonded to Mother.

After the positive drug test result, Father told DCFS he had been taking ADHD medication, which he believed caused his positive drug test. At the time he was tested,

5

Father did not tell DCFS or the laboratory, Pacific Toxicology, that he had been taking ADHD medication. An employee of Pacific Toxicology stated the ADHD medication "might show up as amphetamine . . . [but] there is no known prescription medication that would show up as methamphetamine on a drug panel." Father subsequently tested negative for drugs on March 13, 2014, and April 1, 2014.

**March 25, 2014 jurisdictional and dispositional hearing**

At the jurisdictional hearing on March 25, 2014, DCFS investigator Jeff Steinhart testified Father was a drug user and had a previously sustained allegation of methamphetamine use. In connection with the current matter, Father had tested positive for methamphetamine and amphetamine. Mr. Steinhart was not aware of evidence that Father had ever used drugs while caring for Cole. Mr. Steinhart testified there was "no direct evidence" that Father knew Amber was a drug user, but that even if Father did not know, he was still neglectful in leaving Cole with a babysitter he had known for only two days. Mr. Steinhart testified Father had told police he had met Amber only two days before she took Cole, but Amber told police she was in a relationship with Father and referred to him as "'babe.'" Father told Mr. Steinhart he had met Amber through Danielle, but Father was unable to provide Danielle's contact information.

Jeffrey Maier testified he was a toxicology technologist employed by Pacific Toxicology. Mr. Maier testified that Father's positive drug test was as "close to a hundred percent as I can get." He testified there are no over-the-counter preparations that would cause a false positive for methamphetamine and "prescription medications only containing methamphetamine would cause a positive result."

Father testified Amber was referred to him by a friend as a babysitter who needed a place to stay. Father stated he had known her only two days, but later admitted Danielle had introduced Amber to him two months previously and Amber had spent the night at his house. He stated he had no reason to know she was a drug user. He denied knowing she kept drugs or drug paraphernalia in her bedroom. He stated that on the day of the incident, he had left Cole with Amber for half an hour, then came home at 4:30 p.m. to a note from Amber saying she was taking Cole for a walk. He waited half an

6

hour, then searched for them. Father notified police only at 7:00 p.m. He denied testing positive for methamphetamine, stating he had tested positive for amphetamine. He believed his ADHD medication caused the positive result for amphetamine. He denied ever using methamphetamine or amphetamine in Cole's presence. He denied having "any incidents that brought the attention of the DCFS."

After Father testified, his counsel stated he did not have a basis to request striking the positive drug test results and withdrew previously submitted evidentiary objections.

After argument of counsel, the juvenile court sustained the first amended petition. The juvenile court stated it was weighing the evidence in its totality. The court took into consideration that Father was not "an individual who is unfamiliar with methamphetamine." The court found Father's lack of credibility a "significant factor in [its] decision." Father had denied using methamphetamine, even though he had a past sustained petition and a current positive drug test for methamphetamine. The court found credible Mr. Maier's testimony confirming the positive drug test and opining that only prescribed medication containing methamphetamine could cause a positive test result for methamphetamine. Taking these factors into account, the court determined Father "had reason to know or, at least, suspect" that Amber was a drug user. The court cited Amber's pock marks consistent with the use of methamphetamine, and "more importantly" the methamphetamine and broken syringe found in her room. The court observed Father allowed Cole access to Amber's bedroom, which contained drugs and drug paraphernalia. Father endangered Cole by putting him in the care of Amber, whom Father had invited into his home even though he knew very little about her and allegedly had known her for only two days. Ultimately, Amber was found hours later by the police under the influence of drugs and wandering around with Cole.

"[T]aking into consideration the totality of the evidence the testimony of [Father], which the court did not find to be credible," the court terminated jurisdiction with a family law exit order, placing sole physical custody of Cole with Mother and joint legal custody with Mother and Father. The court ordered monitored visits for Father, "And with regards to any liberalization of those visits, the family court can determine that when

7

they see fit." It also ordered Father to complete a drug program and to participate in a parenting program and individual counseling. In referring to the family court custody order, the juvenile court stated, "And in order to modify the court's orders, . . . Father will have to complete . . . a full drug program with weekly testing, a parenting program and individual counseling." This appeal followed.

## DISCUSSION

### Standard of review

The juvenile court's jurisdictional finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355; Cal. Rules of Court, rule 5.684(f).) "'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.) "[W]e must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

### Substantial evidence supported the juvenile court's jurisdictional findings under section 300, subdivision (b)

Father contends that Cole was not at substantial risk of any future serious harm for two reasons: (1) Father's use of an unfit babysitter was an isolated incident; and (2) Father's single positive drug test does not constitute substantial evidence and there was no evidence Father had exposed Cole to drug use or cared for him while under the influence of drugs.

8

Section 300, subdivision (b) provides for juvenile court jurisdiction if "[t]he child has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b).)

"A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . .' [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) Jurisdiction may be exercised "based on . . . a current or future risk." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435, fn. 5.)

Viewing all conflicts in favor of DCFS and drawing all reasonable inferences in support of the judgment, as we must (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185), we conclude substantial evidence supported the juvenile court's assertion of jurisdiction over Cole.

**The unfit babysitter argument**

Father argues that *In re Savannah M.* (2005) 131 Cal.App.4th 1387 (*Savannah*) is controlling here because he left Cole in the care of an unfit, "suspicious" babysitter only once and he had reacted appropriately when he came home and found Cole and Amber missing. He contends he waited "only a short period" before going out to look for them, then called police. Later, he refused to allow Amber back in his home. He also cites paternal grandmother's and Mother's testimony that Father was a very good father. He points out that Mother stated Father usually hired responsible babysitters and that he was scared by this incident and would never "do it again."

It is true that the appellate court in *Savannah* reversed the juvenile court's jurisdictional finding under section 300, subdivision (b) for lack of substantial evidence.

(*Savannah*, *supra,* 131 Cal.App.4th at p. 1395.)  There, however, the evidence did not support the finding of future serious physical harm when the parents could not have known based on previously changing a diaper that the minors' temporary caretaker would later on engage in sexual abuse.  (*Id.* at p. 1397.)

The juvenile court found different facts in the case before us.  The court found Father was not a credible witness and that he was familiar with methamphetamine use despite his protestations to the contrary.  Because an allegation regarding his use of methamphetamine had been sustained against him and he currently tested positive for methamphetamine, the court reasonably could have rejected his testimony that he had never used methamphetamine.  Father also claimed that the positive test was for amphetamine—and not for methamphetamine—and was the result of his use of ADHD medication.  Because Father had not told DCFS or the laboratory that he was taking ADHD medication until the positive drug test result, the court reasonably could have found him not credible.  The court could have reasonably relied instead on the testimony of Mr. Maier, who confirmed the positive drug test for methamphetamine and stated "prescription medications only containing methamphetamine would cause a positive result."

Based on Father's shifting versions of how long he had known Amber, Amber's insistence on calling him "Babe," and his history of inviting drug addicts into his home in exchange for sex and drugs, the juvenile court also could have rejected Father's testimony that he knew Amber for only two days and that he was unaware of her past criminal history and drug use.  According to the police, Father had previously invited heavy narcotics users into the house to babysit Cole.  Mother testified about her serious concerns about the women Father brought into the house and was not surprised at the allegation that Father had knowingly left Cole in the care of a drug addict.  As stated, it is within the juvenile court's province to weigh the credibility of the witnesses.  (*In re Precious D.*, *supra*, 189 Cal.App.4th at pp. 1258–1259 [issues of fact and credibility are questions for the juvenile court].)

10

Therefore, unlike the parents in *Savannah*, the juvenile court reasonably could have concluded Father knew Amber was a drug addict and that she stored drugs and paraphernalia in her room. Father left Cole in the care of a drug abuser, who was under the influence of drugs and was found wandering with Cole three to four miles from home, hours after he went missing. Father allowed Cole access to Amber's adjacent bedroom, which contained drugs and drug paraphernalia in plain view and within Cole's reach. We conclude substantial evidence supports the court's finding Cole was at serious risk of physical harm.

**The single positive drug test argument**

Father contends there was no substantial evidence supporting the juvenile court's finding Cole was at serious risk of physical harm because Father had only negative drug test results after one positive test for amphetamine and methamphetamine, and there was no evidence he had ever used drugs while caring for Cole or exposed him to any drug use. He relies principally on *In re Destiny S.* (2012) 210 Cal.App.4th 999 (*Destiny S.*) for this assertion.

In that case, the juvenile court asserted jurisdiction under section 300, subdivision (b), based on the mother's admitted history of methamphetamine use and daily marijuana use (albeit not around Destiny), a recent positive test for methamphetamine and marijuana (followed by three negative test results), and tardiness in the previous school year. (*Destiny S.*, *supra*, 210 Cal.App.4th at pp. 1001, 1004.) Despite Destiny's testimony that she was healthy and happy, wanted to be placed with the mother, and that her mother took good care of her and never physically punished her, the juvenile court concluded Destiny was at risk of serious physical harm. (*Id*. at pp. 1001–1002.)

We reversed. We held marijuana use alone would not support the jurisdictional finding, nor would tardiness to school one year earlier but not presently. (*Destiny S.*, *supra*, 210 Cal.App.4th at p. 1003.) Similarly, methamphetamine use nine years earlier and one positive methamphetamine and marijuana test result—followed by three negative ones—did not constitute substantial evidence to support the juvenile court's jurisdictional finding. Finally, we noted that Destiny was a preteen. (*Id*. at p. 1004.)

11

Father contends that *Destiny S.* is controlling because Father's subsequent drug tests were negative and there was no evidence he had ever used drugs while caring for Cole or had exposed him to any drug use. He also contends his home and Cole's room were nicely furnished. He points out that Cole was neat, clean, appropriately dressed, healthy, and stated he wanted to live with Father and had never been physically abused.

The reasons articulated previously with respect to our conclusion that substantial evidence supported the juvenile court's finding that Cole was at serious risk of physical harm apply with equal force here. Father, moreover, was not like the mother in *Destiny S.* As stated, Father had a prior sustained petition in 2010, resulting in a finding he had a history of drug abuse and was a current abuser of drugs. While he provided three negative drug tests, he had also failed to cooperate with DCFS's requests for drug testing on other occasions. Further, at five years old, Cole was not as able to protect himself from physical hazards of accessible drugs and drug paraphernalia as was 11-year-old Destiny; there was uncontroverted evidence here that drug paraphernalia was accessible and within easy reach of Cole in the adjacent bedroom. In addition, far from the safe haven Father claimed his home to be, Father's home had been the subject of 10 calls from police since September 2011 and Father was known to invite heavy drug users to stay with him in exchange for sex and drugs.

We conclude substantial evidence supported the juvenile court's finding that Cole was at serious risk of physical harm.

**Conditioning the family court's modification of the juvenile court's custody and visitation exit order on proof of Father's completion of certain programs and counseling violated section 302, subdivision (d)**

Father argues that the juvenile court's exit order requiring Father to complete drug and parenting programs and individual counseling before the family law court could modify the juvenile court's exit order conflicts with section 302, subdivision (d), and was, thus, an abuse of discretion.

Section 362.4 provides that when the juvenile court terminates jurisdiction over a dependent child, and there is a pending family court case, the juvenile court may issue an

12

order determining the custody of, or visitation with, the minor, which order "shall" become part of the family court file and "shall continue" unless "modified" or "terminated" by that court. (§ 362.4.) An order entered pursuant to section 362.4 is commonly referred to as an "'exit'" order. (*In re John W.* (1996) 41 Cal.App.4th 961, 970, superseded by statute on other grounds as stated in *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 103.)

In *In re Chantal S.* (1996) 13 Cal.4th 196, 203 (*Chantal*), the Supreme Court held that under section 362, subdivision (d),[3] the juvenile court may make collateral orders, such as counseling orders, that are reasonably related to the custody and visitation orders. (*Chantal*, *supra*, at p. 204.) Section 362, subdivision (d) provides that the juvenile court may order the parents of a child in a dependency proceeding to participate in a counseling, parenting, or education program designed to eliminate those conditions that led to the court's assertion of jurisdiction. In devising these orders, "The juvenile court has broad discretion to decide what means will best serve the child's interest." (*In re Corey A.* (1991) 227 Cal.App.3d 339, 346.) "Its determination will not be reversed absent a clear abuse of that discretion." (*Ibid.*)

DCFS cites the authority a juvenile court has to issue collateral orders in crafting an exit order to argue that the juvenile court's order here was well within its discretion. As a general proposition, DCFS is correct that juvenile courts may require participation in counseling and other programs in an exit order. The juvenile court did so here. The issue before us is different, to wit, whether the juvenile court had authority to condition the *family court's* modification of an exit order upon the completion of counseling and other programs in the face of a statute—section 302, subdivision (d)—that requires a particular finding before the family court may modify such an exit order.[4] The juvenile

---

[3] At the time *Chantal* was decided, the language now set forth in section 362, subdivision (d) was contained in section 362, subdivision (c).

[4] Father's failure to object below—indeed, he asked for the programs—does not disable us from addressing whether the juvenile court erred in imposing conditions to the exercise of a family court's modification of an exit order absent the statutorily required

court did not have that authority, and therefore it had *no* discretion to impose such a condition on the family court here.

Section 302, subdivision (d) provides, in pertinent part, that an exit order "shall not be modified in a proceeding or action described in Section 3021 of the Family Code [regarding dissolution or nullity of a marriage, legal separation, and specified custody issues] unless the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." Under section 302, subdivision (d), the decision to modify an exit order was, and is, within the province of the family court, and then only upon a finding of "significant change of circumstances" and that the modification is in "the best interests of the child." The juvenile court, thus, did not have authority to condition the family court's modification of the exit order upon Father's completion of drug and parenting programs and counseling.

---

finding. The issue goes to the allocation of jurisdiction between the dependency and family courts, a legal issue that, contrary to DCFS's assertion, cannot be forfeited. (See *Chantal*, *supra*, 13 Cal.4th at p. 201 [noting that the "two courts have separate purposes" albeit "both courts focus on the best interests of the child"].)

## DISPOSITION

The March 25, 2014 dispositional order is reversed to the extent it conditioned modification of the family court's custody and visitation order upon proof of Father's completion of drug and parenting programs and counseling. In all other respects, the March 25, 2014 jurisdictional and dispositional orders are affirmed.


BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 2/5/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re COLE Y., a Person Coming Under the Juvenile Court Law. | B256594 (Los Angeles County Super. Ct. No. CK 48405) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.Y., Defendant and Appellant. | CERTIFICATION AND ORDER FOR PUBLICATION |

The opinion in the above entitled matter filed on January 28, 2015, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

ROTHSCHILD, P. J.        CHANEY, J.        BENDIX, J.*

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.