Filed 6/24/16  In re Andrew M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDREW M., a Person Coming Under the Juvenile Court Law. | B267960 |
| | (Los Angeles County Super. Ct. No. DK11228) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| SYLVIA D., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Emma Castro, Commissioner.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant Sylvia D.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant Wilfredo M.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and William D. Thetford, Deputy County Counsel for Plaintiff and Respondent.

Wilfredo M. (father) and Sylvia D. (mother) separately appeal from a judgment of the juvenile court terminating jurisdiction over their child, Andrew M. (born June 2007) with a juvenile court custody order granting sole physical custody to mother but joint legal custody to both parents.

Father argues that the juvenile court improperly delegated to mother the power to determine the monitor for father's visits with Andrew.

Mother argues that the juvenile court erred in granting father joint legal custody upon termination of jurisdiction.

We find no reversible error and affirm the judgment.

**COMBINED FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The family consists of mother, father, and Andrew, who was seven years old at the time of detention. Andrew lived with mother but visited father on weekends.

**Initial referral and investigation**

On April 9, 2015, the Department of Children and Family Services (DCFS) received a referral alleging that father was a documented gang member and was using and selling drugs from his home. It appeared that father, seen in the neighborhood with Andrew and other children while father was under the influence, was teaching the child how to be a gang member and how to sell drugs. The reporting party said the only time he had seen father sober was when father was released from jail.

On April 15, 2015, the social worker (CSW) went to father's home and spoke with paternal uncle and paternal grandmother who stated that Andrew lives with his mother. Neither paternal uncle nor paternal grandmother had a telephone number for mother. Paternal grandmother acknowledged trouble between father and mother resulting in father not having mother's telephone number.

During an April 21, 2015 interview of Andrew at his school, the child reported to CSW that he lives with mother, his half-brother Mauricio C., and mother's boyfriend Hector, and that he visits father. Father sometimes yells at him when he misbehaves. Andrew reported that sometimes he walks around the neighborhood with father but he denied ever seeing father sell anything. CSW was unsuccessful in an attempt to make

2

contact with mother. CSW interviewed a neighbor who said that Andrew takes the bus with the neighbor's grandson. The children are clean, well dressed, and the neighbor had no concerns.

CSW made an unannounced visit to father's home on April 23, 2015. Father was thin and his pupils were dilated. He immediately started talking rapidly about how CSW had not returned his telephone calls. Father denied being a gang member. He admitted using marijuana with a prescription. He explained that he was arrested for narcotics because he was caught holding a friend's methamphetamine pipe and using methamphetamine. He also reported having to complete a drug diversion program, but never produced any evidence of completion of such a program. CSW asked father to test for drugs the following day, and father declined, claiming he had to run an errand. When CSW asked him to postpone his errand, father asked why he should change his plans and became agitated. Father took off his shirt, insisting he was not a gang member, and asked CSW if she saw any tattoos on his body. When father refused to stop removing his shirt, CSW left the home. As she walked away, father began videotaping her with his cellular telephone. CSW noted that father's dilated pupils, loud and rapid speech, and agitation were signs that he was under the influence of stimulants during the meeting.

On April 27, 2015, CSW interviewed mother and Andrew. Mother explained that she and father split up when Andrew was two years old. Mother was aware that father had a history of methamphetamine use prior to their relationship. Mother ended the relationship because father was stealing things from her home. Mother suggested to father's family that rehabilitation would be good for father, but that did not happen. Father's family continued to bail him out of jail. Mother said father had been violent with her in the past. She had a restraining order but it expired in January 2014.

Mother stated that there are family law orders in place giving her sole physical custody and sharing legal custody with father. Andrew visits with father every other weekend. Father has no driver license so father's sister Wendy picks up Andrew for visits. Mother receives no child support from father, and father is verbally aggressive

3

with her when they meet. Mother wished to keep her address from father because she remains fearful of him.

Andrew claimed that there is an old man in father's neighborhood who makes things up about father. He also said that when he was visiting father's house the police came to the door. Andrew hid behind a curtain and cried.

On April 28, 2015, father called CSW and reported that he had been at the Department of Public Social Services (DPSS) all day and then there was a problem with the buses, resulting in him being unable to drug test. Father called the drug testing place and was told he could come first thing the next day. On April 29, 2015, CSW received another call from father saying that he was at the drug testing place and needed CSW to approve him for a test on that day. CSW responded that the test was for the previous day.

Father called CSW on April 29, 2015, saying that CSW was not doing her job correctly because she left father's home. CSW indicated she was uncomfortable because father was removing his shirt. When father asked to speak with CSW's supervisor, the contact information was provided. Father indicated he would come to the office to speak with the supervisor and that CSW did not need to tell father to do anything because CSW was not doing a proper job on his behalf. Father continued rambling in this vein for some time before ending the phone call.

On May 1, 2015, CSW contacted DPSS and discovered that father did not report to any office of that department on April 28, 2015. Father did not apply for general relief, as he already has two cases open in different districts.

A search revealed a prior child welfare history for father based on allegations of physical abuse of Mauricio and emotional abuse of Andrew. The referral included allegations of father grabbing Mauricio's ears and hitting him in the head. Father also had an extensive criminal history including but not limited to shoplifting, possession of a controlled substance, DUI, burglary, forgery and grand theft. His most recent convictions were for shoplifting in 2015 and possessing a controlled substance and DUI in 2014.

4

**Petition and detention**

On May 12, 2015, DCFS filed a petition on behalf of Andrew pursuant to Welfare and Institutions Code section 300, subdivision (b)[1], alleging:

> "The child Andrew [M.]'s father, . . . has a history of illicit drug use, and is a current abuser of marijuana and methamphetamine, which renders the child's father incapable of providing regular care of the child. On prior occasions, the father was under the influence of illicit drugs, while the child was in the father's care and supervision. The father has a history of criminal convictions of two convictions of Possession of a Controlled Substance, and Possession of Marijuana 1 oz. or less while driving. The father's use of illicit drugs endangers the child's physical health and safety, placing the child at risk of serious physical harm and damage."

The court made emergency detention findings on May 12, 2015, and trailed the matter to the next day, for mother and child to be present. The court found a prima facie case for detaining Andrew under section 300, subdivision (b), and released the child to mother pending a court order. The court found that release of the child to father was contrary to the child's welfare.

At the May 13, 2015 detention hearing, the court confirmed a prima facie case for detaining Andrew under section 300, subdivision (b), and removed him from father's custody. Andrew was ordered to remain released to mother. The court found father to be the presumed father of Andrew. DCFS was ordered to provide the minor and parents with family reunification services and to provide father with random drug testing referrals. Father was granted visits with Andrew three times per week for up to three hours each, with the visits monitored by a DCFS-approved monitor.

**Jurisdiction/disposition report**

In its June 22, 2015 report, DCFS noted that CSW had interviewed father in person on June 17, 2015, at the DCFS office, during which father appeared angry, agitated, and sweaty. Father stated he had gone to be drug tested the preceding week but could not test that day because he had to go to the social services office. CSW advised

---

[1] All further statutory references are to the Welfare & Institutions Code unless otherwise noted.

father that she had already consulted with the social services department who advised her that father had not gone to social services that day. Father protested that he had, but could not recall the name of his worker or the office location.

Father denied substance abuse problems. He admitted to using marijuana with a prescription for back pain. Father denied ever having smoked marijuana in Andrew's presence. Father stated that he does not have a problem with methamphetamine because he only uses it occasionally -- three times a week and on weekends. Father reported that he has been using "meth" for the past two to three years due to life problems. Father admitted he did not complete a substance abuse program as he previously reported.

When asked about the allegation that he was a gang member, father became agitated and began lifting his shirt to show that he had no gang tattoos. Father felt that the allegation was not properly investigated and complained that the prior CSW had grabbed her purse and left his residence in a rush. Father then alleged there was some sort of conspiracy between the CSW and a neighbor that father felt made the initial allegations. Father exploded and jumped up from his chair and saying "Fuck this shit." As he walked past the receptionist he yelled "So what if I am a drug addict!" CSW was of the opinion father was then under the influence of methamphetamine based on his appearance and behavior during the meeting.

During mother's in-person interview on June 17, 2015, she reported having filed for a restraining order and sole custody due to father's physically aggressive and intimidating behavior towards her between 2009 and 2011. After the visitation order was made, mother would exchange Andrew with father at the police station. Father continues to behave in a volatile manner towards mother. Approximately 10 months earlier, when mother went to the home of paternal grandmother to pick up Andrew, father came to the car and was verbally aggressive towards mother. After that, mother chose not to have any contact with father. Mother reached an agreement with paternal aunt, Wendy that Wendy would arrange the transportation for Andrew's visits. Mother was concerned with father's behavior but she had to follow the court order and allow the visits. Mother has not been in a relationship with father since 2009 and she was not aware that he was

6

using methamphetamine, though she was aware he smokes marijuana. Mother was also unaware of father's criminal activities until she was notified by DCFS. Mother had concerns with paternal aunt and grandmother being the monitor for father's visits as she did not believe they could handle father or enforce the rules. Maternal grandmother could not be a monitor because father had acted aggressively towards her in the past. Mother added that she has concerns that father will take Andrew to Mexico because he has family there.

Andrew told the social worker he felt safe in mother's home, but that he missed his dad. Mother also reported that Andrew felt sad and confused about the current situation with his father. She had been able to get Andrew in counseling through his school, and Andrew had seen a counselor twice a week for the past few weeks.

DCFS recommended the juvenile court sustain the petition, declare Andrew a dependent of the juvenile court, and terminate jurisdiction with a juvenile court order granting mother sole legal and physical custody of the child.

In a last minute information for the court, DCFS informed the court that on July 21, 2015, father was arrested for grand theft and sentenced to 90 days in jail. Father also went to court on August 20, 2015, and was sentenced to 180 days in jail for an unknown offense. Father was incarcerated at the North County Correctional Facility in Castaic. The social worker visited father there, where father reported he did not want visits with his child to take place until after his release.

**Contested jurisdiction/disposition hearing**

At the September 18, 2015 hearing, both mother and father were present. After hearing argument from father's counsel and DCFS, the court found count b-1 as amended true by a preponderance of the evidence and sustained the petition.

The court then heard arguments regarding disposition. DCFS argued that Andrew should remain placed in the home of mother and that jurisdiction be terminated with a family law order granting mother sole physical and legal custody, with father entitled to monitored visits. Mother's counsel and minor's counsel joined in support of DCFS's arguments. Mother's counsel further requested that paternal aunt or another monitor

7

selected by mother be the monitor for father's visits, as paternal grandmother was unable to supervise father.

Father objected to termination of jurisdiction, and asked that the court give him joint legal custody of Andrew. In addition, father asked that paternal aunt and paternal grandmother be his monitors. He also asked that paternal aunt and paternal grandmother get visitation with the child during father's incarceration.

Father requested that after his incarceration, the visits be as frequent as possible. Andrew's counsel agreed with the request, noting that Andrew is very close to his father and wants the visits to continue.

The juvenile court granted DCFS's request to terminate jurisdiction with a home-of-parent order. Mother was to retain physical custody of the child. The child was removed from father and jurisdiction was terminated with an order granting mother full physical custody. Based on the child's contact with father, the court granted joint legal custody to both parents. Father's visits were ordered to be monitored by any monitor approved by the mother. Visits were ordered to occur two times per week for up to three hours per visit, or longer for a Saturday or Sunday visit, when father was released from custody.

Since mother did not object to Wendy being a monitor, the court allowed the record to reflect that paternal aunt Wendy would be an approved monitor for father's visits.

Father filed a notice of appeal on September 18, 2015. Mother filed a notice of appeal on October 2, 2015.

## DISCUSSION

Mother and father have separately appealed from the juvenile court judgment. We discuss each appeal separately below.

### I. Father's appeal

Father raises a single issue on appeal: that the juvenile court improperly delegated to mother the power to determine the monitor for father's visits.

### A. *Applicable law and standard of review*

A juvenile court's visitation order is generally reviewed for abuse of discretion. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557.) A reviewing court must "view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the judgment. [Citation.]" (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.) A trial court's discretionary ruling should not be disturbed absent a showing of clear abuse or a miscarriage of justice. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.)

Section 362.4 provides authority for a juvenile court to issue custody and visitation orders for a child when it terminates jurisdiction. These orders, known as exit orders, may be used to open a file in family law court. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1455.) The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties. (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123 (*T.H.*).) This rule of nondelegation applies to exit orders when jurisdiction is terminated. (*Ibid.*)

However, a visitation order may delegate to a third party the responsibility for managing the details of visits, including the time, place, and manner. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.) While a juvenile court may delegate to a third party such matters as time, place, frequency, duration, when visits should begin, and manner of visitation, it may not delegate whether any visitation will take place. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317-319; *Moriah T., supra*, at p. 1374.)

### B. *The juvenile court order did not constitute an improper delegation of its authority to determine the right and extent of visitation*

Father argues that the problem with the juvenile court's exit order was the supervised visitation requirement. The order reads that visitation will occur "2x/wk up to 3 hrs or 1x/weekend for 6 hrs." The visits were to be supervised by "Paternal Aunt, Wendy [M.] or another monitor approved by mother."

9

Father points out that if paternal aunt could not supervise the visit, mother had sole authority to approve the monitor. If she did not approve of a monitor, then the visit would not occur. Thus, father argues, mother had the power to determine whether a visit would occur if Wendy were not available. Father contends that this amounted to an improper delegation to mother of the discretion to determine whether visitation would occur at all.[2]

Father relies on *T.H.* in support of his argument. In *T.H.*, the judgment terminating dependency jurisdiction placed the children in the custody of their mother. The exit order allowed supervised visitation by father "'to be determined by the parents.'" (*T.H., supra*, 190 Cal.App.4th at p. 1121.) The Court of Appeal agreed with father's arguments that this was an improper delegation to mother of the discretion to allow visitation. Because the order provided that visitation would occur only upon agreement of the parents, mother could conceivably agree to only one visit a year or less without violating the letter of the court's order. (*Id.* at p. 1123.) This was more than simply a delegation of the time, place, and manner of the visit -- it effectively delegated to mother the power to determine whether the visits would occur at all. (*Ibid.*)

The present matter is distinguishable. The juvenile court specifically ordered that Andrew's visits with father should occur twice a week for three hours per visit or once a week on the weekend for six hours. Mother has no authority to change this visitation schedule or to deny father visitation. Should she do so, she would be in violation of the court's order.

---

[2]     Both mother and DCFS argue that father has forfeited this argument. At the hearing, father requested that paternal grandmother and paternal aunt be the designated monitors. Mother objected to paternal grandmother being a monitor. The court granted father's request that paternal aunt be named a specific monitor, then added that any other monitor approved by mother would be acceptable. While father did not specifically object to the final order, the question of whether the order was an improper delegation of the juvenile court's authority is one we have the discretionary authority to address on appeal. (*In re M.R.* (2005) 132 Cal.App.4th 269, 272.)

10

*In re A.C.* (2011) 197 Cal.App.4th 796, cited by DCFS, suggests that the juvenile court order in this case was not an improper delegation of authority. In *A.C.*, the court ordered that the parents agree on a monitor to supervise visitation, but that if the parents could not agree, the father would choose the monitor. (*Id.* at pp. 799-800.)[3] The Court of Appeal determined that this order did not constitute an impermissible delegation of authority to determine whether visitation would occur. (*Ibid.*)

Similarly, here, mother cannot prevent visitation. The juvenile court has only required that mother approve any monitor other than paternal aunt. Under the circumstances, we find no abuse of discretion.

## II. Mother's appeal

Mother also raises a single issue on appeal: that the juvenile court abused its discretion in granting father joint legal custody. Although DCFS recommended to the juvenile court that mother be granted sole legal custody, DCFS has taken no position on mother's appeal. As set forth below, we find no error in the juvenile court's discretionary ruling.

### A. *Applicable law and standard of review*

We review a juvenile court's decision to terminate jurisdiction and issue an exit order for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) Under this standard, we may not disturb the order unless the court exceeded the limits of legal discretion by making an arbitrary ruling. (*Ibid.*)

The juvenile court may make exit orders with respect to both physical and legal custody of a child. (§ 362.4; *Jennifer R.* (1993) 14 Cal.App.4th 704, 711-712 (*Jennifer R.*).) Physical custody is a determination of where the child will reside. Legal custody is the right and responsibility to share in making decisions related to the health, education, and welfare of the child. (Fam. Code, § 3003.) In making exit orders concerning

---

[3]    There was a conflict between the oral visitation order and the form final judgment. The Court of Appeal determined that the oral order, which mandated visitation but allowed the parents discretion to determine the monitor, was controlling. (*In re A.C., supra*, at p. 798.)

11

physical and legal custody, the juvenile court must look to the best interests of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 973-974, superseded by statute on another point as stated in *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 102-103.)

While not controlling, the Family Code can provide some guidance as to the factors to be considered in determining the best interest of the child when it comes to custody decisions. (Fam. Code, § 3011.) Factors to be considered include the health, safety and welfare of the child; any history of abuse by one parent; the nature and amount of contact with both parents; and the habitual or continued use of controlled substances or abuse of alcohol or prescribed controlled substances by a parent. (*Ibid.*)

### B. *No abuse of discretion occurred*

Mother relies on *Jennifer R.* in support of her argument that father should not have been granted legal custody of Andrew in this matter. In *Jennifer R.*, the juvenile court awarded the father sole legal and physical custody of the one-year-old child. In addressing mother's request for joint legal custody, the court referred to a report from mother's therapist which indicated that mother was not in a position to be helpful in making decisions for the child, and that those decisions were more appropriately left in the hands of the father. (*Jennifer R., supra*, 14 Cal.App.4th at p. 710.) On appeal, the court determined that mother's inability to take care of herself and her children, her failure to make progress in overcoming the problems leading to the child's removal, and her inconsistency and inappropriateness in visitation, all amply supported the juvenile court's decision that legal custody should not be vested in mother. (*Id.* at p. 713.)

Mother argues that father exhibited similar problematic behaviors to the mother in *Jennifer R.* He had a prior child welfare history and a history of aggressive behavior towards mother. He had an unresolved history of drug problems, had failed to follow through with rehabilitation, and minimized his admitted drug use. He was incarcerated for grand theft during the pendency of the juvenile matter, and would not be visiting with Andrew while incarcerated. Under the circumstances, mother argues, the juvenile court abused its discretion in granting father joint legal custody of Andrew.

However, the facts of the present matter are not identical to those in *Jennifer R.* Unlike the child in *Jennifer R.*, Andrew was not an infant but a seven-year-old child at the time the dependency petition was filed on his behalf. He had consistently visited with father his entire life. Mother reported that Andrew has been sad and confused about the situation with his father during the pendency of the petition. At the dispositional hearing, Andrew's counsel agreed with father's counsel that visits between Andrew and father should be as frequent as possible: "My client's very close to his father and wants the visits to continue." The juvenile court took note of the close relationship between Andrew and father, finding "[b]ased on the father's contact with . . . the child, the court is going to grant joint legal custody."

It was permissible for the juvenile court to consider the nature and the amount of contact between father and Andrew in making its custody order. (See Fam. Code, § 3011.) While mother argues that father's history of drug use and physical abuse rendered him unfit to be a custodial parent, we note that the juvenile court considered father's troubling behaviors in granting mother sole physical custody. As noted by the *Jennifer R.* court, father's history of aggression is more relevant to his fitness for physical custody than legal custody. (*Jennifer R., supra*, 14 Cal.App.4th at p. 711, fn. 2.) It was well within the court's discretion to allow father joint legal custody, thus we will not disturb the ruling on appeal.

### DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
HOFFSTADT

13