Filed 5/21/21  In re D.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076055 |
| Plaintiff and Respondent, | (Super.Ct.No. J282474) |
| v. | OPINION |
| R.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

In 2019, D.B., an autistic boy born in September 2011, was removed from the custody of R.B. (Father) and placed with his mother, R.P. (Mother), a previously non-custodial parent, under Welfare and Institutions Code[1] section 361.2.  After a year of services and supervised visits with Father, the juvenile court terminated its jurisdiction over D.B. and issued exit custody orders granting full legal and physical custody to Mother while providing Father with weekly supervised visits.  On appeal, Father contends the juvenile court abused its discretion when it ordered supervised visitation.  We find no abuse and affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.     GENERAL BACKGROUND INFORMATION

Father and Mother had an acrimonious relationship and had been involved in family law court since 2014 over the care of D.B.  In June 2014, Father filed for, and was granted, a temporary restraining order against Mother.  In July 2014, the restraining order was rescinded.  Father also filed for divorce from Mother and requested full custody of D.B.  In August 2014, Mother filed for, and was granted, a restraining order against Father due to domestic violence.  In 2016, the parents participated in a Family Law section 730 evaluation due to a lack of communication and frequent conflicts.  On June 28, 2019, Father was granted sole legal and physical custody of D.B. while Mother was granted weekend and midweek visits.

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

The parents also had a lengthy history with child protective services. Since July 2, 2014, the San Bernardino County Children and Family Services (CFS) had received 22 child abuse referrals. It appears that most of the referrals were made by either Mother or Father against the other and involved feeding issues with D.B. All of the referrals were either evaluated out or "unfounded," as CFS saw them as family law issues.

D.B. is autistic and has sensory issues. As a result, he had ongoing problems with food and gaining weight. D.B. was "very fussy about what he [ate] and [had] difficulties with textures." Due to his diagnosis, D.B. had received Applied Behavioral Analysis (ABA) and occupational therapy centered around D.B.'s eating habits. Mother is a registered nurse and was educated about caloric and nutritional needs. Both parents immigrated to the United States from India. While Mother became a citizen of the United States, Father had not obtained immigration documents allowing him to continue to reside in the United States and there were deportation orders for Father to leave the country.

B.    CURRENT DEPENDENCY

In September 2019, the family again came to the attention of CFS, after D.B. was admitted to a hospital for rapid weight loss since his mother had been in India for three weeks. The reporting party stated that D.B. kept losing weight in Father's care while gaining weight in Mother's care and that D.B. appeared to be happy with Mother, but upon seeing Father, he cried out "no" and grabbed his stomach. Father repeatedly claimed Mother force fed D.B. He also took D.B. to the hospital before and after visits

3

with Mother. Between July 28 and September 5, 2019, Father took D.B. to the hospital 10 times to be evaluated for his eating and weight issues. Mother denied force feeding D.B. and noted that he ate in her care.

The hospital outpatient social worker observed D.B. eating well when Mother brought food to the hospital. She also noted that Mother had good interactions with D.B. and that D.B. had no evident sensory challenges with Mother. In contrast, Father sought excessive medical attention for D.B. but did not interact with the child at the hospital. CFS's social worker also observed Mother feed D.B. during an interview. The social worker noted D.B. ate the food provided by Mother and that Mother was encouraging. The social worker learned that while Mother followed medical directives, Father did not follow the clinical recommendations consistently, which limited D.B.'s progress.

Following an investigation and interviews with medical doctors and staff, CFS was concerned about releasing D.B. from the hospital to Father's care. CFS noted that D.B. would "continue to lose weight and be malnourished" in Father's care. CFS was also concerned about Father constantly taking D.B. to doctors and subjecting him to many unnecessary hospital procedures. D.B.'s gastroenterologist opined " '[n]othing is organically wrong with the child and feeding is a part of his autistic challenges.' " Because there was no evidence Mother had force fed D.B. and only Father had reported such, and D.B.'s weight loss was behavioral and not medically rooted, CFS removed D.B. from Father's custody and placed him in Mother's care.

4

On September 16, 2019, a petition was filed on behalf of D.B. pursuant to section 300, subdivision (b) (failure to protect). The petition was later amended to add allegations of serious emotional damage to D.B. pursuant to section 300, subdivision (c), due to the parents' extreme hatred toward each other.

At the September 17, 2019 detention hearing, the juvenile court formally detained D.B. from Father's custody and placed him with Mother. Father requested unsupervised overnight and weekend visits. The court ordered supervised visits for Father and advised Father to contact CFS to coordinate the visits and to report any issues with the visits. The court ordered Father not to contact Mother, and Mother was not to supervise Father's visits. The parents were provided with services pending the jurisdictional/dispositional hearing.

CFS recommended against Father's participation in D.B.'s medical care. Father was unable to follow medical recommendations or opinions and continued to insist Mother was abusing D.B. CFS believed Father had to accept D.B.'s diagnosis, D.B.'s limitations, and to demonstrate appropriate levels of encouragement to successfully reunify with D.B. Despite the parents' animosity towards each other, they both were genuinely attached and bonded to D.B. D.B. was excited to see both parents and exhibited a bond and attachment to both of the parents. CFS opined that while it was very clear Father loved D.B. very much, Father was unwilling to accept D.B.'s limitations and blamed the child's delays on Mother. CFS believed it was in D.B.'s best interest to have one parent provide for his needs due to a lack of consistency. Because

5

Father had difficulties incorporating and implanting the techniques taught while holding a belief that he was strictly adhering to them, CFS recommended the responsibility for D.B.'s nutritional and medical needs be delegated only to Mother.

While Mother made progress in her pre-dispositional services and cooperated with CFS, Father did not. As such, at a January 13, 2020 hearing, the court advised Father to cooperate with CFS. Counsel for CFS pointed out that Father had exhibited " 'excessive' " behaviors, such as "calling 911 on CFS in the parking lot" and being "extremely combative."

On February 20, 2020, Father in propria persona filed a section 388 petition seeking return of D.B. into his custody. Father also sought an order for D.B. to participate in "behavioral analysis," an intake feeding program at a children's hospital, and ABA therapy. The court denied the petition as premature.

On April 10, 2020, Father in propria persona filed a second section 388 petition seeking a video conference call "every day [for] one hour[]" with D.B. as in-person visits had been suspended due to COVID-19. He also sought unsupervised visits at his house every other day, except weekends. The court denied Father's request, noting that "visitation is subject to the court's general order of 3/27/2020 due to COVID-19. CFS to comply with that order to the extent possible."

Father in propria persona filed three more section 388 petitions on June 22, August 20, and September 14, 2020, seeking additional visitation, among other requests. Father sought D.B.'s participation in a "21 day intake feeding program" at the children's

6

hospital and continued to insist D.B. was force fed and was at risk in Mother's care. Father's concern stemmed from the fact that D.B. had gained 16 pounds in six months, and Father believed D.B. was at risk for being overweight and obese. The court denied each request as premature, noting the court has not taken jurisdiction in the case, the matter was set for trial, and D.B. was not a dependent of the court.

On July 14, 2020, CFS filed a second amended section 300 petition dismissing several allegations against Father and all the allegations against Mother.

At the September 29, 2020 pretrial hearing, Mother's counsel requested the court to admonish Father not to harass Mother. Counsel explained, "within the last two weeks, the mother has been contacted by Kaiser service providers, including a GI doctor, insisting that the child be brought in to the doctor based on phone calls and misinformation being provided by the father and outright lies about the child's current medical condition." D.B.'s counsel and counsel for CFS joined Mother's request. The court cautioned Father not to provide "bad information" to D.B.'s medical providers but encouraged him to contact the child's medical providers for a status on the child's health.

By October 2020, CFS had changed its dispositional recommendation to dismissal of the case with family law exit orders granting full custody to Mother as a previously non-custodial parent. CFS noted Father had made no progress in his pre-dispositional services and continued to provide false claims to the medical providers that Mother had force fed D.B. CFS also explained that D.B. was thriving in Mother's care and had met several of his objectives, such as personal and emotional growth. D.B. had not displayed

7

any disruptive social behavior or emotional outbursts and was not aggressive or self-injurious. He also made reasonable progress in his educational goals. However, he showed no progress in self-care and required assistance with daily tasks to which Mother had attended. D.B.'s October 23, 2020 behavioral health reassessment report noted he had improved in almost all of the recorded skill areas: communication, self-direction, leisure, social skills, health and safety, and self-care. Functioning academics, community use, and home living remained at near previously reported scores. D.B.'s August 20, 2020 child examination showed D.B. was "[w]ell-developed, well-nourished" and exhibited "no distress" with appropriate affect.

The contested jurisdictional/dispositional hearing was held on October 26, 2020. At that time, Father and a pediatric doctor who specialized in autism and learning behavioral disorders testified. Following testimony and argument from the parties, the juvenile court found true the allegations in the second amended petition as modified according to proof. Regarding disposition, the court removed D.B. from Father's custody and maintained him with Mother. The court provided Father with supervised visits at a professional visitation center, once a week for two hours. The court denied Father's request for unsupervised visits, finding it was not in D.B.'s best interest. The court explained, "the difficulty with giving unsupervised visits to the father is that after the visits that Mother has had with this child, Father would take the child to be weighed each and every time, and had numerous visits to emergency rooms, to urgent care, to others to try to find that Mother was, in fact, at fault; that Mother had done something wrong. So

8

the Court does not believe that it's in the best interest of [D.B.] to have Father given unsupervised visits." The court also found that Father "[had] [n]ot cooperated with initial services offered at detention" and "[had] not made progress in alleviating the problems that led to detention."

The court issued family law orders granting Mother sole legal and physical custody with his primary residence being in Mother's home. An additional requirement was placed on Father's ability to modify the family law visitation order in family law court. The requirement stated " 'visitation should remain supervised' " " '[u]ntil Father acknowledges his role in the minor's care, and understands his responsibility to care for the child versus punishing the mother.' " The court also advised Father that the family law orders may be modified upon a showing of a significant change of circumstances and that the change in order would be in the best interest of the child. Father appealed.

## DISCUSSION

Father's sole contention on appeal is that the juvenile court abused its discretion in ordering supervised visits with D.B. because it failed to consider the necessary factors and articulate a rationale supported by the record. We disagree.

"Section 362.4 provides that when the juvenile court terminates jurisdiction over a dependent child, and there is a pending family court case, the juvenile court may issue an order determining the custody of, or visitation with, the minor, which order 'shall' become part of the family court file and 'shall continue' unless 'modified' or 'terminated' by that court. [Citation.] An order entered pursuant to section 362.4 is commonly

9

referred to as an ' "exit" ' order." (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1455.) "When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.' [Citations.]" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513, citing *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*) and *In re Chantal S.* (1996) 13 Cal.4th 196, 206 (*Chantal S.*).) Supervised visitation is warranted where unsupervised visits would jeopardize the child's safety. (See § 362.1, subd. (a)(1)(A) & (B).)

The family court that will be responsible for enforcing or modifying the juvenile court's visitation order is equally capable of ensuring that the custody and visitation take place as ordered. (*Chantal S.*, *supra*, 13 Cal.4th at pp. 203-204.) A juvenile court terminating dependency jurisdiction and making custody or visitation orders "does so as a court with 'a special responsibility to the child as *parens patriae* and [it] must look to the totality of a child's circumstances when making decisions regarding the child.' [Citation.]" (*In re J.T.* (2014) 228 Cal.App.4th 953, 963.)

The juvenile court has broad discretion to make custody orders when it terminates jurisdiction in a dependency case. (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 265, fn. 4.) The decision to terminate dependency jurisdiction and to issue custody and visitation orders pursuant to section 362.4 is reviewed for abuse of discretion, and we will not disturb that decision unless " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

10

Father does not challenge the juvenile court's decision awarding sole custody to Mother or terminating dependency jurisdiction. Rather, he claims the court abused its discretion in issuing the visitation order because it relied on improper factors and failed to consider the safety risks and the "strong bond" between him and D.B. He believes short unsupervised visits with D.B. would not pose a safety risk to the child.

A juvenile court may reasonably determine that continued supervision of the child as a dependent is no longer necessary for the child's protection, but at the same time determine that conditions on visitation are necessary to minimize, if not eliminate, the danger that visits might subject the child to the same risk of neglect, abuse, or emotional harm that previously led to the dependency adjudication. (*Chantal S.*, *supra*, 13 Cal.4th at p. 204.) Here, in fashioning its exit orders, the juvenile court implicitly concluded that dependency was no longer necessary, provided Father's visitation was supervised. In *Chantal S.*, our Supreme Court approved a similar conclusion on the ground it was preferable to forcing the child to remain indefinitely in the juvenile court dependency system while the parent attempted to resolve his problems. (*Ibid.*)

This case is similar. Mother here was taking good care of D.B., and D.B. was happy and thriving under Mother's care. While Mother cooperated with CFS and pre-dispositional services, Father did not. Although Father did not physically abuse D.B. and the record shows a mutual bond between Father and D.B., as the juvenile court found, Father " 'ha[d] not made progress in alleviating the problems that led to detention.' " Father had never had unmonitored visits with D.B. and had yet to merit the closure of his

11

child's dependency.  Father continued to harass and blame Mother for D.B.'s challenges and appeared to be blinded by his hatred toward Mother.  Those issues, coupled with Father's continuing hostility toward Mother and CFS, provided a sufficient basis for the juvenile court to find it was not in D.B.'s best interest to provide Father with unsupervised visits.

Furthermore, the record supports an inference Father was not acting in D.B.'s best interest in an unsupervised setting.  When he did have full legal and physical custody of D.B., Father constantly subjected D.B. to numerous unnecessary medical appointments.  Indeed, he brought D.B. to the emergency room approximately 15 times in 60 days for eating issues or purported abdominal pain, despite D.B. exhibiting no signs of distress or weight loss necessitating a feeding tube.  Moreover, Father filed five section 388 petitions—the fifth as recently as September 2020, a month before the contested dispositional hearing—seeking to enroll D.B. at a children's hospital feeding program, which required an endoscopy to qualify.  However, in August 2019, D.B.'s gastroenterologist advised Father that the risks of the endoscopy procedure outweighed its benefits and recommended against the procedure.  The court could reasonably conclude that if Father were allowed unmonitored visitation, even if short, Father's persistence in having D.B. undergo unnecessary medical procedures and appointments, which was detrimental to D.B., would continue.

We reject Father's claim the juvenile court failed to "fully" consider D.B.'s best interest in making its visitation order.  The court's consideration of D.B.'s best interest is

implicit in both the court's statements on the record and the resulting order. The court

did not abuse its discretion in ordering supervised visits for Father.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                                    
                                                    J.

We concur:


RAMIREZ                            
                    P. J.


SLOUGH                          
                    J.