Filed 6/1/21  In re Sofia K. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In the Matter of SOFIA K., a Person Coming Under Juvenile Court Law. | B307495 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KRISTOPHER K.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP02240A) |

APPEAL from orders of the Superior Court of Los Angeles County, Kim Nguyen, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

In the proceedings below, the juvenile court sustained a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) regarding minor Sofia K. (born December 2009). Specifically, the court found that appellant-father Kristopher K.'s mental conditions and symptoms thereof rendered him incapable of providing regular care and supervision for 10-year-old Sofia and placed her at substantial risk of serious physical harm. The court then released Sofia to her mother, granted Father a minimum of six hours of weekly, monitored visits, and terminated jurisdiction, finding it was not in Sofia's best interest to keep the case open.[1]

On appeal, Father contends the court erred in: (a) taking jurisdiction because substantial evidence did not support a finding that he had mental health issues, or that such issues placed Sofia at risk of harm; (b) removing Sofia from his custody because substantial evidence did not support a finding that releasing Sofia to his custody would

_____

[1] Mother is not a party to this appeal.

2

constitute a substantial danger to her safety, because there were other reasonable means to protect Sofia short of removal, and because DCFS failed to make reasonable efforts to prevent removal; and (c) terminating jurisdiction and granting Mother sole physical custody because it was not in Sofia's best interest and because the decision was premature without a mental health evaluation. Finding no error, we affirm.

## STATEMENT OF RELEVANT FACTS

### A. *Previous Dependency and Criminal History*

Between 2010 and 2018, DCFS received five referrals regarding Sofia. Two were unfounded, one was evaluated out, one was inconclusive, and one resulted in a sustained petition in May 2014. Jurisdiction resulting from the sustained petition terminated in January 2017, with a juvenile custody order providing split custody between Mother and Father.

### B. *DCFS Investigates the Current Referral*

In April 2020, DCFS received a referral alleging that two days earlier, the Sheriff's Department had asked Mother to pick up Sofia from Father's home. According to the referral, Sofia had reported that during the previous week, Father continuously told her people were "after him," and the previous night, Father had forced her to stay up "looking for wires and other objects hidden in his home by people out to harm him." Father instructed Sofia to "find wires and

follow them w[h]ere[]ever they lead," and required her to "pull up carpeting." The tips of Sofia's fingernails were scraped off from this activity. Investigating this referral, a children's social worker (CSW) spoke with the Sheriff's detectives and the family, among others.

### 1.    Sheriff's Detectives

The CSW reviewed logs of Father's calls to the Sheriff's Department and learned he had called them with a report that "he had found a camera" in his apartment, but that a "neighbor was tugging on it from the outside." The CSW also spoke with the detectives who had responded to Father's call. One of them noted that the carpeting in Father's apartment was torn up, the baseboards were pulled out, and there were holes drilled in the drywall. The detective also saw vodka bottles on the floor and counter, and a marijuana pipe. Father did not appear to be under the influence, but "was acting manic, speaking fast and pacing around, sitting down and immediately getting up." Father also reported that people had been running on his roof.

None of the responding detectives interviewed Sofia; some stated she appeared fine, while another said she looked confused, but that she "was agreeing with Father about hearing noises and seeing a camera." She told the detectives Father had only "been acting like this" for a few weeks. Sofia had a "small divot on her finger" and admitted to helping Father remove the baseboard and carpet, but denied staying up all night. She "knew Father's actions were

4

'cookoo'" but did not think Father was crazy. Sofia believed Mother was trying to take her away from Father.

### 2.  Mother

Mother told the CSW the Sheriff's detectives had not called her to pick up Sofia, and that her arrival was part of a normal custody exchange. Mother mentioned Father had been shaking, and refused to remove his sunglasses though everyone was indoors. Mother stated that Father had admitted to keeping Sofia up all night looking for cameras. She also stated that he had put screws into a corner in the floor "to try to trap a camera that someone was retracting" and had drilled holes in the walls, ceiling, and front door. Sofia told Mother that her finger was cut, but refused to show it to her. Sofia appeared agitated and had been saying there were "twelve people running on the roof and shooting lasers into the windows." Since the day Mother picked her up, Sofia had alternated between being "goofy and playful" and being "hostile" to Mother because she thought Mother was "trying to take her away from Father." Mother believed Father had "brainwashed" Sofia, and stated he had "told Sofia that if she tells Mother everything, she may take her away from him and he will have to have a new baby."

Because Sofia missed Father, Mother permitted her to call him under her supervision, but he immediately began talking about "cameras and spying," so she took the phone away from Sofia. Mother also recounted that three weeks earlier, Father had asked her to keep Sofia with her for an

5

extra day "because there [we]re cameras in the home and he need[ed] to make sure that Sofia [wa]s safe." At the time, Mother thought someone might have put a camera in the home to spy on a past tenant, and because Father sounded calm when he made his request, Mother continued permitting Sofia to go to Father's home. Sofia had been returning without issue from her recent visits, though "about three weeks ago, she complained that father just wants to drink and stay home."[2]

The next day, Mother informed the CSW that Father had called her, asking if he could take Sofia a few days early so they could go to Florida for a while. Father had also told her he had "nailed the windows shut," and she opined that Father was "'crazy as shit.'" The following day, Mother informed the CSW that Father had been buying material from Home Depot to "barricade the doors of his home," and that Father had told her that "people had reversed his air ducts to poison him with carbon dioxide."

### 3. Sofia

The CSW observed a "small indent" on one of Sofia's fingers, which Sofia explained resulted from helping Father

---

[2] Mother also discussed Father's problems with alcohol, and mentioned an incident from two years earlier in which he was driving with Sofia while intoxicated and "swerv[ed] the car . . . ." After Sofia called Mother because she was scared, Father called her a "'fucking rat.'" Mother mentioned other instances in which Father verbally abused Sofia.

"'open up the carpet.'" Sofia stated that during the last three days of her visit, Father was looking for cameras because he thought the neighbors had installed some to spy on them. The first two days, Father was simply "looking around a little," but on the last day "he was looking through the house all day and had her help him . . . ." They "'opened up the carpet,' looked through drawers and looked for pinholes that could have cameras." At one point, she was in her room, but Father asked her to come out and get him some tools because "he said he found the camera." Sofia was "'kind of freaking out' because Father was so high energy and she could not figure out which tools he wanted." Eventually, Father "used the tools to screw screws into the wall to keep the camera from retracting." Sofia stated she did not see any cameras, but did hear a noise that "sound[ed] like a whirring noise," which she attributed to the retraction, and she also saw "some motion down one of the holes that she [thought] was the camera pulling back." She had also heard people walking on the roof.

Father showed Sofia a mark on the ceiling fan, and Sofia thought "this may be a tag for the house before people come back and do something bad . . . ." She reported she had seen lasers flickering into the home from the window, and that they looked like the lasers on guns. She needed to verbally calm herself down after seeing the lasers. She coped with what was happening at Father's house by "tak[ing] in the information and breath[ing] out the bad feelings." She also expressed frustration that Mother had

spoken with the police, and felt sad because she thought Mother would be taking her away from Father. Sofia stated Father knew he was not to drink around her, and claimed she had "only seen him drink a single beer or wine, but not a whole bottle . . . ."

A few days later, when Sofia was informed the court had detained her from Father, she told the CSW that "Mother was making a big deal out of this and that it was not a big deal." She also claimed "there were really people doing things to Father's house."

### 4. Father

Father contended he had heard people on the roof, and "weird sounds" in the walls. He denied being paranoid, and stated his neighbors were "messing with him." When the CSW visited, Father was "fairly calm" throughout the interview, though he also appeared "guarded and upset" that the CSW was asking detailed questions about drugs and mental health. When the CSW asked about his vape pen, he remarked, "'I guess I should have hid this.'" He admitted to drinking "moderately," but stated he did not like to drink in front of Sofia. Father refused the CSW's request that he undergo a psychiatric evaluation.

Father reported that the "odd things at his apartment started happening about a month ago." It was around the time he began staying up later as he was not working. He heard people on his roof, both during the day and at night; while he would go outside to yell at them to get off, he never

actually saw them. However, he stated someone had put a portable radio on the roof, which played "random noises like a dog barking or circus music." Father had called the Sheriff's Department many times over the issue, but they told him they did not see anyone on the roof.

He also reported that he knew someone had been in the house because a coded key-safe that had been on the front door was gone. He found a hole drilled into his sliding glass door that permitted it to be "pop[ped] open." He had drilled holes in his front door, "because his peephole was not letting him see the person when someone knocked on the door." When the CSW pointed out there were holes in the lower half of the door, Father responded "he was not sure if people were ducking down."

Father had downloaded a phone app he claimed would detect hidden cameras, and the app had informed him there was such a camera in his ceiling fan. He also pointed out markings on the fan that had "appeared after the app had shown [Father] a camera might be there."

Father stated that the night of the incident, he had "heard something while he was in bed and suspected that someone was running wires into his house, so he pulled up the carpet and thought he saw something moving. He explained that someone could do this by drilling a hole from the patio and running the wire through. He stated that he stabbed the screwdriver and screws into the ground in order to try to catch the wire and then called the Sher[]iff's."

## C.    *DCFS Files a Petition*

In mid-April 2020, DCFS obtained an expedited order to remove Sofia from Father.  Based on the investigation, the CSW concluded that it appeared that "Father's erratic behavior is the result of hallucinations and paranoia, but CSW has been unable to ascertain its cause due to Father's limited cooperation."  Four days later, DCFS filed a petition under Welfare and Institutions Code section 300, subdivision (b)(1) (Section 300(b)(1)) for Sofia, noting she was detained with Mother.  The petition contained four counts.

Count b-1 alleged that Father's history of mental health issues and current symptoms of paranoia, delusions, and auditory hallucinations rendered him incapable of caring for Sofia and placed her at risk of serious physical harm.  Counts b-2 and b-3 alleged that Father's history of substance abuse, including an incident in which he drove under the influence while Sofia was in the car, rendered him incapable of caring for her.  Count b-4 alleged that Father had created a dangerous home environment for Sofia in that, eight days before the petition was filed, Father had drug paraphernalia on a counter within easy access of Sofia. Additionally, counts b-1 and b-2 alleged that Mother knew of Father's issues but failed to protect Sofia.

At the initial detention hearing in April 2020, Sofia's counsel relayed Sofia's request that joint custody be restored, but expressed counsel's own view that such an outcome would be an unsafe risk.  Mother, too, agreed that Sofia should be left in her care.  Father requested Sofia be

released to both parents, claiming he had no mental issues, and that the incidents he observed had actually occurred. He accused Mother of orchestrating the situation in an attempt to change the custody arrangements. Father additionally stated that if the court did not release Sofia to both parents, he would request a "no time waiver" trial. The court found prima facie evidence to detain Sofia and ordered she remain detained with Mother. The court granted Father six-hour minimum visits, and monitored phone or video calls. Father was also ordered to submit to random drug tests.

### D.  *DCFS Continues Its Investigation*

In May 2020, a dependency investigator (DI) spoke with Sofia, Mother, and Father.

#### 1.  **Sofia**

Sofia's story was mostly consistent with what she had previously stated, though she now claimed to have actually seen a "little black thing getting tugged in[to]" the floor, and "strings going . . . behind the walls and stuff." She claimed she "tried to tug on it, but . . . couldn't catch it because it wheels up really fast." She explained that when Father was acting paranoid, it was "scary because every little sound you get scared or spooked." She believed a court order prohibited Father from drinking around her and claimed he did not, but also said that she saw him drink a beer that week, and

thought he might have taken a sip of vodka.[3] Sofia was worried that Father missed her.

### 2. Mother

Mother's statements were also consistent with what she had previously told DCFS, and she emphasized that she did not discover the depth of Father's belief regarding hidden cameras until others became aware of it. Referring to the time Father had asked her to keep Sofia for an extra day because he had found a camera, she stated "[h]e is an electrician, he had never exhibited any unusual behavior, and he very factually stated that to me that he had found a hidden camera. He said he was going to take it down and that was that." She opined that Father "both believes this and is really suffering from a mental illness or maybe, he is really facing a threat." But she stated she was neither a mental health professional nor an investigator and would follow the lead of professionals.

Mother also mentioned that Father had canceled a visit with Sofia for an unstated reason. She stated she got "'a bunch of weird text[s] from him'" and thought he might be drunk. She mentioned that her sister (Sofia's aunt) was now residing with Father, and according to the sister, he was

---

[3] Father and Mother both contended a family court order permitted Father to have "'just one' drink and no more" while with Sofia. This order is not in the record.

12

drinking excessively every day.[4]  Mother stated that there was "enough concern" and "enough bizarre behavior" that Father should "at least get evaluated" and "have a third party opinion instead of . . . his own self-assessment."

### 3.    Father

Father stated that he had heard people "stomp" on his roof in the middle of the night.  Subsequently, he saw that the ladder giving access to the roof was not locked, so he put electrical wire where the lock would have gone and twisted it.  Several days later, the wire had been removed.  He then noticed some Amazon packages were missing and saw a hole drilled into his patio door that had not been there previously; this hole allowed the door to be opened from the outside.  He also noticed things missing from his home.  Father stated that he flew his drone up to the roof where his air-conditioning unit was located and found it "completely ripped apart . . . [t]he whole thing was frozen over."

The weekend that occasioned the referral, Father "was already freaking out and . . . was hearing things in the wall . . . ."  He clarified, "I don't know if I even actually heard anything at all."  However, he called the Sheriff's Department and both detectives and Mother arrived.  The Sheriff's detectives spoke with Father "like I'm a mental patient," and Father admitted he "didn't get to sleep until

---

[4]    When the aunt was asked, she said only that Father had an "occasional[] drink."

really late [the previous night] because me and my buddy were drinking and we were up until about three in the morning . . . ."

The night before the detectives came, Father was awakened by a sound and heard "sliding." One of Father's dogs was barking where the sound appeared to be coming from, so Father "pulled up the carpet to see what it was and the dog was sitting there scratching at it." Father stated he did not know what he had heard but that he and Sofia both pulled up the carpet and "both of us cut our fingers because there were tacks." He acknowledged that he "sound[ed] crazy." Regarding the alleged drunk driving incident, Father claimed he had not been drinking, but instead had an incident of road rage.

In mid-May, the CSW contacted Father and informed him that he was required to complete drug testing, but had already missed three tests. Father protested that he did not know he was required to drug test, but the CSW explained it was a court order to test on demand. While Father originally agreed to test, he later claimed he had a long road trip planned and would be out of the state for three weeks. He stated that he refused to "'put [his] life on hold for this.'" There were four scheduled drug tests after the CSW's call; Father tested negative three times, and failed to appear for one. Father reported that since the Sheriff's detectives had come out, there had been no further noises.

### E. *Adjudication, Disposition, and Termination of Jurisdiction*

The day of the adjudication and disposition hearings, DCFS submitted a last minute information changing its original recommendation of providing Father with family enhancement services in favor of finding Sofia a dependent and subsequently terminating jurisdiction, with Mother being awarded sole physical and legal custody and Father being granted monitored visits. DCFS noted that Father continued to "engage, behave and project aggression towards" Mother and Sofia, that he had "repeatedly and adamantly voiced his disregard for the Department and Court orders and more recently, sent the mother and child Sofia inappropriate and emotionally abusive text[] message[s] regarding the family's current involvement with the Department and Court, as well as, their current family dynamics," and that Sofia continued to "express extreme stress, guilt and anxiety regarding her father and his recent underlying issues."[5] The report also stated that without Father's cooperation regarding a psychological evaluation, DCFS could only speculate as to Father's issues and thus did not believe Father would benefit from support and involvement from DCFS or the court.

---

[5] Father had texted Mother that Sofia would be placed in foster care, which he would prefer to having Sofia be with Mother because Mother was a "psycho" who needed help. He also texted Sofia that when she turned 14, she could choose with whom to live, and that Mother was an "evil demon" "[f]rom hell."

15

At the start of the adjudication hearing, Father requested a continuance for "good cause" in order to obtain a mental health evaluation to demonstrate his lack of mental health issues; he additionally promised to cooperate with any treatment should a doctor say otherwise. DCFS opposed the request, noting the court could proceed with the evidence before it. After confirming that Father had requested a "no waiver trial," the court denied the continuance request, finding, "there has been ample opportunity to marshal whatever evidence each side wishes to present to the court."

Father was the only witness to testify at the adjudication hearing. He claimed he had no history of mental or emotional problems, no symptoms of paranoia, delusions, or auditory hallucinations, no diagnosis of a psychiatric or psychological disorder, and no medical prescriptions for such a disorder. In March 2020, he discovered that someone had broken into his apartment because: (a) there was some "weird writing" on his ceiling fan; (b) he had been having issues with some younger guys in the neighborhood "who were kind of walking on the roof and kind of harassing me"; (c) he realized the key-safe that he had kept in the house was missing (it had originally been outside in case Sofia needed a key, but Father had moved it into the apartment); and (d) there was a new hole drilled in the sliding door to his patio, through which it could be unlocked. He also testified about an unlocked ladder permitting access to the air-conditioning units on the roof, and how his air-conditioning unit was completely ripped

16

apart and "frozen over," while everyone else's was undamaged. When the technician came out to fix the unit, he confirmed that the last time he worked on the unit, it was not in its present state. Father claimed that after the Sheriff's detectives spoke with his neighbors, the harassment stopped.

Father described himself as a social drinker, who did not drink at all when Sofia was present. He denied smoking marijuana when caring for Sofia and claimed he had never driven while under the influence when Sofia was a passenger; the incident Sofia had described was actually an incident of road rage. Father claimed that because Mother had her own issues with alcohol and brought Sofia to Alcoholics Anonymous meetings, Sofia could be sensitive to alcohol consumption. While Father did have a marijuana pipe in his bathroom, he claimed Sofia had no access to it.

After the court invited argument, DCFS's counsel stated it would neither argue counts b-2, b-3, or b-4, nor oppose Mother's anticipated request that the court find her non-offending and strike the allegations concerning her. She reserved the remainder of her argument for rebuttal. Sofia's counsel agreed with dismissing counts b-2, b-3, and b-4. Counsel also advised that while Sofia maintained the truth of the various statements she had made about what had occurred at Father's house, counsel urged the court to sustain count b-1 as to Father, based on the "totality of the evidence in the reports." As to disposition, Sofia's counsel

agreed with the department's proposal of joint legal custody, with Mother being awarded sole physical custody.

Father's counsel asked the court to dismiss the b-1 count because DCFS had failed to prove Sofia had suffered any harm. She argued that DCFS presented no mental health diagnosis regarding Father, and that while Father recognized some of his reported statements seemed "wild and out there," he was being harassed and his reactions were reasonable. But even were his views not based in reality, she argued there was no evidence they were harming Sofia. As for disposition, Father would agree to terminating jurisdiction only if he were awarded 50 percent custody. Otherwise, he would request the opportunity to participate in services. Mother's counsel agreed that Mother should be dismissed, and concurred with DCFS's disposition recommendation.

In rebuttal, after summarizing some of the evidence of Father's mental health issues, DCFS's counsel argued that Sofia was, in fact, harmed because Father had forced the child to stay up all night and "participate" in his mania, and that Sofia stated when she was at Father's apartment, every sound "spooked" her. As to disposition, DCFS's counsel requested that Sofia remain in the care and custody of Mother, and that Father be granted only monitored visits.

The court dismissed counts b-2, b-3, and b-4. As to count b-1, the court sustained an amended version that read: "The child, Sofia K[.]'s father, Kristopher K[.], has ongoing mental and emotional conditions and exhibits symptoms of

18

. . . paranoia, delusions, and auditory hallucinations, which render[] the father incapable of providing regular care and supervision for the child. Such mental and emotional conditions and behavior on the part of the father endanger[] the child's physical health and safety, and place[] the child at risk of serious physical harm, damage, [and] danger." The court acknowledged Father had "testified calmly" but found the testimony "absolutely does not square with . . . more credible evidence from law enforcement . . . ." The court found that "Sofia was made to participate in a series of actions that began to escalate" and that Father's exhibition of "symptoms of paranoia, delusions, and auditory hallucinations," "absolutely" impacted Sofia. The court discussed Sofia's "fear at every single sound that she hears because her father gets spooked out," her worries "about lasers going into the house because they are associated with guns," and that Sofia had "been made to physically participate in the investigation of the home by helping pull up baseboards and carpets," which resulted in chipped fingernails. The court found that "all of this put together shows that the father's conduct demonstrated . . . a break from reality that does rise to the level of placing this child at substantial risk of serious physical harm."

Moving to disposition, the court found that "given the father's testimony today, it would be in the child's best interest that the court close the case today," as Mother was an appropriately protective caregiver. The court found clear and convincing evidence that giving Father custody would

19

pose a substantial risk of detriment to Sofia, that no safety measures could be imposed to protect Sofia, and that Father could avail himself of the family court to obtain a change in custody. The court denied Father's request for joint physical custody or unmonitored visits, citing its belief that Sofia was not safe in his custody, because Father failed to acknowledge that his actions were symptoms of his mental health issues. The court also ordered Father to undergo individual and mental health counseling, and submit to drug tests. It specified that Father was to have a minimum of six hours of monitored visitation weekly, unless both Mother and Father agreed to increase it. After granting both parents legal custody of Sofia and granting Mother sole physical custody, the court terminated jurisdiction. Father timely appealed.

## DISCUSSION

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under a substantial evidence review, "'we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) "Evidence from a single witness, even a party, can be sufficient to support

20

the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

### A. *The Court Did Not Err in Finding Jurisdiction*

Jurisdiction under Section 300(b)(1) is warranted if, under the totality of the circumstances, "there is a substantial risk that the child will suffer . . . serious physical harm . . . as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ." (Welf. & Inst. Code, § 300, subd. (b)(1); *In re J.K., supra,* 174 Cal.App.4th at 1440.)

At the conclusion of the adjudication hearing, the court found that Father had suffered a "break from reality," and that his "paranoia, delusions, and auditory hallucinations," were "absolutely" impacting Sofia. The court specifically listed Sofia's fear at "every single sound" she heard, her worry about "lasers going into the house because they are associated with guns," and Father's forcing her to "physically participate in the investigation of the home by helping pull up baseboards and carpets," resulting in her fingernails being chipped. The court concluded that "all of this put together shows that the father's conduct demonstrated . . . a break from reality that does rise to the level of placing this child at substantial risk of serious physical harm."

21

Father argues a lack of substantial evidence supported either the finding that he had mental health issues, or that those issues placed Sofia at substantial risk of serious physical harm. We disagree.

### 1. Father's Mental Health

Substantial evidence supports the court's finding that Father suffered a "break from reality." Father reported "hearing things in the wall" that he was unsure were actually there.[6] He drilled holes into his front door. He believed unknown persons had installed retractable cameras in his apartment, which could be removed by pulling on wires located in the walls or under the floor. In his quest to find these cameras, Father enlisted Sofia to stay up all night and help him tear up the carpets and baseboards in his apartment. Father also inserted screws into the floors and walls to "trap" cameras being retracted. Father believed someone had installed a camera in his ceiling fan. However, despite all the "evidence" of cameras, nothing in the record indicates Father ever produced one. For example, though Father believed a camera had been installed in his ceiling fan, he does not explain why he did not demonstrate its existence by removing it (or even taking a picture of it) to show law enforcement or DCFS.

---

[6] Father admitted, "I don't know if I even actually heard anything at all."

Father also reported that people had consistently harassed him by walking on his roof.  He had never seen these people, despite going to look, but deduced their existence from an unlocked ladder giving access to the roof, a destroyed air-conditioning unit, and his belief that someone had left a portable radio on the roof, playing "random noises like a dog barking or circus music."  Mother reported that Father had told her he had "nailed the windows shut," that he was going to "barricade the doors of his home," and that "people had reversed his air ducts to poison him with carbon dioxide."  And while there were instances in which Father appeared calm -- including his testimony at trial -- when he first interacted with the sheriff's deputies, he "was acting manic, speaking fast and pacing around, sitting down and immediately getting up."  He was also shaking, and refused to remove his sunglasses though everyone was indoors.

Father denies none of this evidence.  Instead, he points to other evidence that could have supported a finding that he had no mental health issues, such as the fact that "there was no mental health diagnosis . . . ."[7]  But when """"two or more

---

[7]    There is no merit to Father's accusation that the court denied him the opportunity to obtain such an evaluation.  During DCFS's initial investigation of the referral, a CSW asked Father if he would be willing to undergo a psychiatric evaluation, and he refused.  Moreover, Sofia was detained from Father in an April 2020 hearing.  The adjudication hearing took place in July.  Nothing in the record indicates Father even attempted to obtain a psychiatric evaluation in the three months between the two hearings.  As the court correctly found, "there ha[d] been ample
(*Fn. is continued on the next page*.)

inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.""" (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) That other evidence might have suggested that Father was not mentally unstable has no bearing on whether substantial evidence supported the opposite finding.

### 2. Harm to Sofia

"'Harm to a child cannot be presumed from the mere fact the parent has a mental illness.'" (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226.) However, the "inability to precisely predict how [a parent]'s illness will harm [the children] does not defeat jurisdiction. . . . [I]t is sufficient that [the parent]'s illness and choices create a substantial risk of *some* serious physical harm or illness." (*Id.* at 1226-1227 [affirming jurisdictional finding because mother had continued to drive with kids while experiencing effects from mental illness, though children had yet to suffer actual harm].)

Here, substantial evidence supported the court's finding that Sofia had already been placed at substantial risk of serious physical harm, and that Father's mental health issues would continue to put her at further risk.

---

opportunity to marshal whatever evidence each side wishe[d] to present to the court."

Father admits that when he enlisted Sofia to stay up all night helping him tear up the carpet and baseboards to look for cameras, she injured her finger "because there were tacks." Carpets and baseboards are not intended to be removed by a 10-year-old child using her bare hands. While the injury Sofia sustained did not appear severe, we think it common sense to note that this was due more to happenstance than impossibility.

Moreover, Father has never acknowledged any mental health issues -- not during the investigation, not at trial, and not on appeal. To the contrary, he adamantly insists he "had no mental health issues." His failure to acknowledge these issues is substantial evidence that they will not be addressed. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) So long as Father's mental health issues remain untreated, there is a substantial risk that Father will again draft Sofia into tearing up the apartment in search of hidden surveillance mechanisms, which could cause her serious physical harm. Further, there is no guarantee that Father's obsession would be limited to removing floor coverings. He had already insisted a camera was installed in his ceiling fan; any efforts to recruit Sofia into helping him take the ceiling fan apart would pose obvious dangers. Similarly, Father claimed to hear noises in the walls, and responding deputies had noticed holes drilled into the drywall. It requires no great leap of imagination to conclude Father could progress into drilling bigger holes into the walls to find

25

cameras or retracting wires and, in the process, expose electrical wiring. Sofia's involvement in such an endeavor would pose a serious risk of physical harm as well.

Father argues that Sofia's "staying up for one night with her father based on sounds she also corroborated hearing as noted above, was not a substantial risk of harm." Father also points to his testimony that the noises and other problems with the neighbors had ceased after the Sheriff's visit, as proof that the event would not reoccur. Father misses the point.

First, the issue is not whether staying up for one night constitutes a risk of harm in and of itself; the issue is whether staying up for one night because Father forced Sofia to help him tear up the flooring to look for hidden cameras due to his untreated mental health issues constitutes a substantial risk of harm. Second, Father's claim that he has not been harassed by his neighbors since the Sheriff's visit would be potential proof that no similar event would reoccur only if the neighbors had been the cause of Father's actions in the first place. As discussed above, however, substantial evidence supports the finding that the real problem was not the neighbors or any cameras they had allegedly planted, but Father's untreated mental health issues. On this record, we find substantial evidence supported the court's finding that Father's mental health issues placed Sofia at substantial risk of serious physical harm.

**B.** *The Court Did Not Err in Removing Sofia From Father*

A court may remove a minor from a parent's custody if it finds clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's, . . . physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).) "'A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent.' [Citations.] It is not required that the parent be dangerous or that the child have been harmed before removal is appropriate. [Citation.] 'The focus of the statute is on averting harm to the child.'" (*In re D.D.* (2019) 32 Cal.App.5th 985, 996.)

Father argues the court erred in removing Sofia because: (1) no evidence supported a finding that she was at substantial risk of harm if left in Father's custody; (2) there were available means short of removal to protect her; and (3) DCFS failed to make reasonable efforts to prevent the need to remove her. We address and reject each contention in turn.

### 1. Evidence of Risk of Harm to Sofia

As discussed above, substantial evidence supported the court's conclusion that Father's untreated mental health issues placed Sofia at substantial risk of serious physical harm. The same evidence supported the court's conclusion that leaving Sofia in Father's custody would constitute a substantial danger to her physical health and safety.

Father again does not deny this evidence, but instead points to other evidence that could potentially support a finding that returning Sofia to his custody would not create a substantial danger, such as the fact that Sofia felt safe with him and had confirmed perceiving some of what he had perceived, or that many people thought Father seemed calm and rational. Again, the question before us is whether substantial evidence supported the finding the court made, not whether other evidence might have supported a different one. (*In re Misako R.*, *supra,* 2 Cal.App.4th at 545.)

### 2. Other Means to Protect Sofia

Father also argues there were other means to protect Sofia, short of removal. Specifically, he suggests that Sofia could have been ordered to report any ongoing issues to Mother, that Father could have been ordered to comply with a safety plan or undergo a psychiatric evaluation, that DCFS could have conducted unannounced home visits, and that Father could have been permitted "[s]hort, daytime interaction . . . ." These methods would have been insufficient.

28

First, Sofia was a 10-year-old girl who missed her Father and was worried about him. Mother reported to DCFS that Father had "told Sofia that if she tells Mother everything, she may take her away from him and he will have to have a new baby." She also reported that since the day of the incident, Sofia had manifested hostility to Mother periodically because Sofia thought Mother was "trying to take her away from Father." Sofia showed signs of minimizing Father's actions and changing her statements regarding what had occurred, perhaps in an attempt to bolster Father's credibility to forestall her removal from his custody. When initially questioned about the incident, Sofia said only that she had heard a "whirring" noise, and had seen "some motion" in the holes Father had drilled into the floor. She recognized that his actions were "'cookoo.'" But when informed a few days later that she was being removed from Father's custody, Sofia claimed that Father's actions were "not a big deal," and that "there were really people doing things to Father's house." Still later, when DCFS continued its investigation after the detention hearing, Sofia claimed to have seen "the little black thing getting tugged in[to]" the floor, and to have seen "the strings going . . . behind the walls and stuff." She stated she "tried to tug on it, but [she] couldn't catch it because it wheels up really fast." Given this record, we find that relying on Sofia to report on Father's mental health issues to the parent she thought was trying to take her away from Father would be an unreasonable and ineffective means of protection.

Nor do Father's other suggestions fare any better. Any devised safety plan could protect Sofia only if Father could be expected to adhere to it. But Father had already violated the court's orders regarding discussing case issues with Sofia, as well as showing up for all his drug tests, and had potentially violated another court order regarding drinking in Sofia's presence.[8] Father does not explain how undergoing a psychiatric evaluation would protect Sofia. While it would surely be the first step toward treating any mental health problems, until such time that those problems were addressed and ameliorated, Sofia would still be at risk. And while unannounced visits from DCFS could provide some measure of protection, DCFS could not monitor Sofia around the clock. Indeed, it was during the night that Father enlisted the child in his quest to locate and disable hidden surveillance by tearing up the flooring. Finally, it is unclear what Father means when he suggests he could have been permitted "[s]hort, daytime interaction"; the court

---

[8] While the actual order is not in the record, there was evidence that Father was permitted to have only one drink when he had custody of Sofia. Nevertheless, he admitted that the night before the incident (while Sofia was in his custody), he "didn't get to sleep until really late because me and my buddy were drinking and we were up until about three in the morning . . . ." Additionally, when asked about a vape pen he used, his reaction was, "'I guess I should have hid this.'" That Father's reaction to potentially unfavorable evidence was to conclude he should have concealed it does not inspire confidence that he would have been forthcoming with DCFS, had it instituted a safety plan.

granted him at least six hours per week of monitored visits, in which he presumably could interact with Sofia for short periods of time during the day.[9]

### 3. Reasonable Efforts to Prevent Removal

"The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . ." (Welf. & Inst. Code, § 361, subd. (e).)  Father argues the court's conclusion that reasonable efforts were made was unsupported by substantial evidence, because DCFS could have provided a mental health assessment or could have "tested short unmonitored visits . . . ."[10]  We are unconvinced.

---

[9]    To the extent Father suggests the court should have granted him unmonitored visits, substantial evidence supports the court's denial of that request, based on its finding that Sofia would not be safe in Father's custody.

[10]    Father also argues the court "failed to consider whether there were reasonable efforts that could be made to eliminate the need for removal."  To the extent he complains the court did not explicitly determine whether reasonable efforts were made to prevent or eliminate the need to remove Sofia from Father, he has waived any potential error by failing to object below.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court.  [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected"].)

The evidence demonstrates DCFS tried to provide a mental health assessment for Father, but he refused to submit to one. In his reply brief, Father points out DCFS made this offer before disposition and contends he could not be forced to undergo such an evaluation until after jurisdiction was established. But whether Father could have been required to submit to such an examination has no bearing on whether DCFS made a reasonable effort to offer him one. Father admits that it did.

We find unreasonable Father's suggestion that DCFS could have "tested short unmonitored visits in a neutral setting to see if all went well . . . ." As previously discussed, substantial evidence supported the court's conclusion that Sofia was not safe in Father's custody. No authority requires the court, in the face of such a conclusion, to find that DCFS should have risked Sofia's safety to "test" whether Father's conduct would have placed her in harm's way. Moreover, after DCFS began investigating but prior to the filing of the petition, Father had contemplated removing Sofia from the jurisdiction of the court by taking her to Florida. In the face of such plans, giving Father unmonitored access to Sofia was unwarranted. We find substantial evidence supported the court's removal of Sofia from Father.

## C. *The Court Did Not Err in Granting Mother Sole Physical Custody*

After finding jurisdiction over Sofia, the court granted both parents joint legal custody, granted Mother sole physical custody, and terminated jurisdiction, despite Father's request that the case remain open and that he be permitted to participate in services. We review a court's decision to terminate dependency jurisdiction and issue a custody order for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; see also *In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1456 ["'The juvenile court has broad discretion to decide what means will best serve the child's interest . . . .' [Citation.] 'Its determination will not be reversed absent a clear abuse of that discretion'"].) Father admits he had no legal right to services because Sofia was placed with a custodial parent (see *In re Pedro Z.* (2010) 190 Cal.App.4th 12, 19), and that the court had discretion to terminate jurisdiction and grant sole physical custody to Mother, but argues it was nonetheless an abuse of discretion to do so. Specifically, he argues the court abused its discretion in granting sole physical custody to Mother because: (1) substantial evidence did not support the court's finding that this was in Sofia's best interest; and (2) the court made its decision without a full psychiatric evaluation of Father.[11] "''The appropriate test for abuse of discretion is

_____

[11] While we review the decision to terminate custody for an abuse of discretion, we review the factual bases underpinning the decision for substantial evidence.

33

whether the trial court exceeded the bounds of reason.'"'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) We discern no abuse of discretion.

1.    **Substantial Evidence Supports the Court's Determination That Granting Mother Sole Physical Custody Was in Sofia's Best Interest**

After taking jurisdiction over Sofia, the court considered whether it was in the child's best interest to keep the case open, or to close the case and award sole physical custody to Mother, who was adequately protecting her. The court concluded that "given the father's testimony today, it would be in the child's best interest that the court close the case today" and awarded sole physical custody to Mother.

"The goal of dependency proceedings—to reunify a child with at least one parent—has been met when, at disposition, a child is placed with a former custodial parent and afforded family maintenance services." (*In re Pedro Z.*, *supra*, 190 Cal.App.4th at 20; see also *In re Destiny D.* (2017) 15 Cal.App.5th 197, 208 ["the fundamental goal of the dependency system [is] to return the child to his or her custodial parent and terminate dependency jurisdiction as soon as circumstances permit"].)

As discussed above, substantial evidence supported the court's finding that Sofia was not safe in Father's custody. The same evidence supported the finding that it was in Sofia's best interest not to return to Father's custody. If

Sofia was not to be returned to Father's custody, and Mother was properly protecting her, then it was self-evidently in Sofia's best interest that Mother be awarded sole physical custody.

Father argues removing Sofia from his custody was not in her best interest because the child loved him, and the two shared a bond. Father cites no authority -- and we are aware of none -- providing that a child's love of and bond with a parent is dispositive in deciding the child's best interest. The court also properly considered the potential harm Sofia could suffer if returned to Father's custody. Moreover, despite Father's claim that the court's order "eliminate[d] Father from her life," Father was granted a minimum of six hours of visits per week. Additionally, he could apply to the family court for a change of custody.[12]

---

[12] Father argues that this order prejudiced him, because it required him to demonstrate to the family court both a significant change of circumstances, and that modifying the custody order would be in Sofia's best interest. But prejudice to the parent is not the concern in a dependency proceeding -- the child's best interest is. We see no error in placing Father in a situation in which regaining custody of Sofia will depend on demonstrating both that the circumstances justifying her removal from his custody, viz., Father's mental health issues that jeopardized her safety, have significantly changed, and that returning Sofia to Father's custody would be in her best interest.

35

## 2. The Court Did Not Abuse Its Discretion in Terminating Jurisdiction Without a Psychiatric Evaluation

Father argues the court made its custody order "prematurely without a full psychological or psychiatric evaluation as requested by Father, who had no current mental health diagnosis." As discussed above, Father was offered a mental health evaluation -- he refused it. Furthermore, he requested a "no time waiver" trial, and the record is devoid of any attempt to withdraw this request until the adjudication hearing itself, when Father requested a continuance to belatedly obtain a mental health evaluation. Father has pointed to no evidence in the record that he made any effort in the three months between Sofia's detention and the adjudication hearing to obtain a mental health evaluation. As the court correctly found, "there ha[d] been ample opportunity to marshal whatever evidence each side wishe[d] to present to the court." On this record, we conclude the court did not exceed the bounds of reason in proceeding without a mental health evaluation.[13]

---

[13] Father also argues the court erred in ordering only six hours of weekly, monitored visits, because: (1) it would be a financial burden on Mother; and (2) Sofia missed her Father and wanted to return to the previous custody arrangement. Mother has not appealed the court's order and, in fact, requested that the court grant her sole physical custody. Additionally, the court did not exceed the bounds of reason by prioritizing Sofia's safety over her desire for Father to have joint physical custody.

**DISPOSITION**

We affirm the court's jurisdictional and dispositional orders, as well as its order awarding sole physical custody to Mother and terminating jurisdiction.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.